LAND, Justice.
 

 On June 13, 1936, Jackson Cheramie, plaintiff, granted to the defendant, N. A. Moore, an oil, gas and mineral lease on a tract of land situated in Township 19 South, Range 22 East, Parish of Lafourche, containing 51 acres, more or less. A bonus of $25 in cash was paid for the lease. A primary term of ten (10) years from date of lease, and as long thereafter as oil, gas or other mineral is produced from the land, is stipulated in paragraph 2 of the lease.
 

 In paragraph 4 of the lease it is provided that, if operations for drilling are not commenced on said land
 
 on or before a year front this date,
 
 the lease shall then
 
 terminate as to both parties
 
 unless, on or before such anniversary date, the lessee shall pay or tender to the lessor or to the credit of the lessor in Citizens Bank & Trust Company at Cut Off, La., the sum of $25, “(herein called rental),” which shall cover the privilege of deferring commencement of drilling operations
 
 for a period of twelve months.
 
 It is further provided that: “In like manner and upon like payments or tenders annually the commencement of 'drilling operations may be further deferred for successive periods of twelve (12) months each
 
 during the primary term.”
 
 Tr., pp. 53-55, inclusive. (Italics ours.)
 

 This lease was recorded in the Conveyance Office of Lafourche Parish on June 15, 1936.
 

 On October 21, 1936, N. A. Moore, lessee, assigned a one-fourth (1/4) interest in the lease to Joseph M. Perkins. The assignment was also recorded in the Conveyance Office of that parish November 19, 1936.
 

 The lease was executed prior to any activity in the Golden Meadow Field in Lafourche Parish. On February 26, 1937, Jackson Cheramie made a top lease (Tr. 59), and then brought the present suit to cancel the lease of date June 13, 1936, which was duly recorded June 15, 1936. Tr. p. 7.
 

 Both N. A. Moore, lessee, and Joseph M. Perkins, his assignee, are made parties defendant to this suit.
 

 The suit is based upon the contention that plaintiff, Jackson Cheramie, does not speak the English language, and that N. A. Moore, defendant, does not speak the French language. That Moore, in order to get the lease, represented through one Rudolph J. Cheramie, an interpreter, that he wanted a lease for a period of one year and that the lease would become void unless a well was drilled within that period. Pet., paragraph IV, Tr., pp. 7 and 8.
 

 In paragraph V of the petition, it is alleged that the well was not drilled within one year from June 13, 1936, the date of the lease, and has not since been drilled. In paragraph VI it is alleged that petitioner “now finds” that the lease contained provisions which Moore represented that it did
 
 *420
 
 not contain and, particularly, the clause providing for annual rentals and the deferment of drilling operations from year to year for ten years. Tr. pp. 8 and 9.
 

 Petitioner, therefore, alleges that his signature to the lease, “as evidenced by his mark on said lease,” was obtained by fraud and that, therefore, petitioner is entitled to have the lease canceled and rendered null and void, and erased from the records of the Parish of Lafourche. Tr., p. 9.
 

 In their answers, the .defendants, Moore and Perkins, deny all of the substantial averments of plaintiff’s petition. In particular, defendants deny categorically any misrepresentations. Defendants allege payment of rentals on the first and second anniversaries . of the rental payment set out in the lease, May 12, 1937, and May 2, 1938, the rental payments being made by deposits by the lessee in the Citizens Bank & Trust Company at Cut Off, La., to the credit of plaintiff, Jackson Cheramie, lessor, and the withdrawal by him of the sums so deposited by the rental agreement.
 

 The case was tried on May 29 and May 30, 1939, and on the latter date was submitted to the court, without argument by both sides, and decided immediately in favor of the defendants by dismissing plaintiff’s suit at his cost. (Tr. pp. 5, 6, 142.) From this judgment plaintiff has prosecuted this appeal. It is evident from the allegations of plaintiff’s petition that the case involves only a question of fact, namely, whether Mr. Moore procured the lease from Mr. Cheramie under representations that it was ■'a'.one-year .lease, without any. renewal provision.
 

 The district judge had no difficulty in deciding this question of fact immediately at the conclusion of the testimony.
 

 (1) The misrepresentations alleged in the petition were not made by the defendant, N. A. Moore, to plaintiff, Jackson Cheramie, for the reason that N. A. Moore was not present during the negotiations that ended in the signing of the lease.
 

 Mr. Moore testified as follows:
 

 “Q. Were you present, Mr. Moore, when the plaintiff in this case, Jackson Cheramie; signed an oil, gas and mineral lease to you ? A. I was not.
 

 “Q. You do not know, then, what representations were made tp plaintiff in this case, Jackson Cheramie, to induce him to sign this lease? A. I was not present.” Tr., p. 72.
 

 (2) Defendant, Joseph M. Perkins, after stating as a witness that' he negotiated the lease of Jackson Cheramie to N. A. Moore, and that he did hot represent himself to be Mr. N. A. Moore to Jackson Cheramie, or to any other witness for plaintiff, testified as follows:
 

 “Q. Do you know where Mr. Moore was- when the lease :was .negotiated? A. I presume he was in Texas, at his residence.
 

 “Q. Do you know whether or not he was in the vicinity where- the lease was negotiated, or.in Louisiana? A. I know that he was not in the vicinity of Golden Meadow.” -Tr., p. 128.
 

 (3): After testifying that he saw Rudolph Cheramie actually sigh Jackson Cher
 
 *422
 
 amie’s name to the lease, and saw Jackson Cheramie touch the pen, Reginald G. Ryan gave the following testimony:
 

 “Q. Who requested his presence, do you recall? A. It was either Jackson Cheramie or one of his brothers. * * *
 

 “Q. You know that you didn’t go for him? A. I didn’t go.
 

 “Q. And that Mr. Perkins didn’t go for him? A. No, he didn’t go.” Tr., pp. 118, 119.
 

 (4) Rudolph Cheramie is a first cousin of the plaintiff, Jackson Cheramie, and keeps books in the store of Daize Cheramie, his uncle.
 

 The witness testified as follows:
 

 “Q. On June 12, 1936, Mr. Cheramie, did Jackson Cheramie come to the store where you worked? A. Yes, sir.
 

 “Q. Did he make any request of you? A. Yes, sir.
 

 “Q. What did he ask you? A. He asked me if I wanted to go on the other side where he stayed, at a little shop they got close to the ferry,
 
 to be a witness on a lease,
 
 because he wanted to lease his property.
 

 “Q. Did you go with him? A. Yes, sir.
 

 “Q. And whom did you find when you arrived there?, A. They had
 
 Mr. Mgore
 
 and Mr. Ryan, Theodore Cheramie, Alidore Cheramie and Jackson Cheramie and myself.
 

 “Q.
 
 Mr. Perkins,
 
 would you mind standing up ? (Mr. Perkins stood in compliance with the request)
 

 “Q. Is this the gentleman whom you referred to as
 
 Mr. Moore?
 
 A. Yes, sir.
 

 “Q. Did he tell you that he was Mr. Moore? A. Yes;, sir.'
 

 “Q. Did they ask you
 
 to explain
 
 to Mr. Jackson Cheramie the terms and conditions of a lease that they expected to make with him? A.
 
 No, sir.
 

 “Q.
 
 What did they ask you to do? A.
 
 To sign, if I wanted to be a witness.
 

 “Q. And did you sign as a witness? A. Yes, sir.
 

 “Q. Did you write Jackson Cheramie’s name for him? A. Yes, sir.
 

 “Q: He is unable to sign his name ? A. Yes, sir.
 

 “Q. Well, did they make any attempt
 
 to explain
 
 to Mr. Jackson- Cheramie what was in this lease ? A.
 
 No, sir.
 

 “Q. Now, was there anything said as to how long the lease was for? A. Yes, sir.
 

 “Q.
 
 And who made the statement as to how long the lease was for? A. Mr. Regan.
 

 “Q. Mr. Ryan? A. Yes, sir.
 

 “Q. What did Mr. Ryan say? A. For one year.
 

 “Q. He (referring to gentleman identified as Moore) was present-when the statement was made that the lease was for one year?, A. Yes, sir.
 

 “Q. Did he attempt, to- correct it? A. No, sir. -, ;
 

 “Q. Now, did you
 
 'translate into French
 
 and tell Mr. Jackson Cheramie
 
 that-the lease
 
 
 *424
 

 was for one year?
 
 A.
 
 No. I read it myself
 
 but I didn’t
 
 explain
 
 it'to Jackson.
 

 “Q. Was Jackson Cheramie
 
 aware, by the terms they used and the gestures they made,
 
 that it was for one year ? A.
 
 Yes, sir.”
 
 Tr., pp. 84, 85, 86. (Italics ours.)
 

 On cross-examination Rudolph Cheramie testified as follows:
 

 “Q. Did- you
 
 read
 
 the lease ? A.
 
 Myself, yes.’
 

 “Q. You read it over
 
 from beginning to end? A. Yes, sir.
 

 “Q. Did you say anything to Jackson Cheramie about the rental provisions of the lease ?
 
 A. I told him it was for one year.
 

 “Q. You say you told him it was for one year? A. Yes, sir.
 

 “Q. But you saw it was for
 
 ten years? A.
 
 No, sir,
 
 one year.
 

 “Q. All right. Let us read this lease over. Just take this lease, Mr. Cheramie, and read it. You said you
 
 read
 
 this lease ?
 

 A.
 
 No, sir.”
 
 Tr., p. 91. (Italics ours.)
 

 The witness then attempted to extricate himself from the dilemma in which he had been placed, by stating that a piece of paper covered the top of the lease down to paragraph 4, and had written on it, “ ‘Jackson Cheramie, married once to Celestine Terrebonne,’ and below they had
 
 a lease for one year.”
 
 Tr. p. 92. (Italics ours.)
 

 The witness, when examined by the court, admitted that he read what was on the top sheet and 'that he read also
 
 from the fourth paragraph down, both before he signed it and afer he signed it as d witness.
 
 Tr., p. 93.
 

 The fourth paragraph of the lease reads as follows: “If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Citizens Bank and Trust Co. Bank at Cut Off, La. * * * the sum of Twenty-five and no/100 Dollars ($25.00), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each
 
 during the primary term."
 
 (Italics ours.)
 

 He was further asked by the court:
 

 “Q. When you read it before you signed it, did you give Jackson Cheramie
 
 any information
 
 as to what you found in it? A.
 
 No, sir.
 
 The only thing I read it myself and said it was alright.
 

 “Q. What did you say when you read the balance of it? A. I didn’t
 
 explain
 
 to him anything.
 

 “Q. What did he ask you to go there for ? A.
 
 To be a witness.
 

 “Q. He didn’t express to you any desire for you to tell him what it was he was signing? A.
 
 No, sir.
 

 “Q. You didn’t
 
 try
 
 to tell him? . A.
 
 No, sir."
 
 Tr., p. 93. (Italics ours.)
 

 On recross-examination, the witness was asked by the court, after stating that he had read paragraph 4 of the lease':
 

 
 *426
 
 “Q. Did you understand the English of it when you read it? A. Yes, sir.”
 

 By counsel:
 

 “Q.
 
 You knew what it meant? A. Well, as I was telling you a while ago
 
 I didn’t read all of it.
 

 “Q. Didn’t you tell the Court a while ago that
 
 from the point where it was covered with this covering, you read it all?
 
 A.
 
 No, sir.
 
 I read
 
 part only.
 

 “Q. What part did you read ? A. The
 
 top
 
 one. This here was on that silk paper. (Witness illustrated.)
 

 “Q. What did you read on
 
 the bottom? A. I didn’t read the bottom. I just seen that.”
 
 Tr., p. 94. (Italics ours.)
 

 The manifest contradictions of this witness in his own testimony are self-impeaching, and render his testimony unworthy of belief.
 

 Besides, the top sheet, which witness refers to as the “silk paper,” was attached to the top of the lease with an ordinary wire clip, which could have been lifted up readily, ' and the entire contents of the lease on the lower sheet could have been seen and read ’easily. It is incredible that such a patent artifice should have been adopted by def end- ’ ants to perpetrate the fraud alleged by plaintiff as to the term of the lease. Tr., p. 92.
 

 (5) The statement of Rudolph Cheramie that he was asked by Jackson Cheramie
 
 to be a witness only
 
 is flatly contradicted by the following testimony of Jackson Cheramie himself:
 

 “Q. Did you go and get Rudolph? A. Yes, sir.
 

 “Q. Did you bring him to where these two gentlemen (Perkins and Ryan) were? A. Yes, sir.
 

 “Q. Were the terms and duration of the lease
 
 discussed? A.
 
 I asked Rudolph
 
 to see that the lease was made for one year
 
 and with the condition that
 
 they would establish my boundary lines within sixty days,
 
 but I don’t know whether Rudolph told them that or not?
 

 “Q. Did you see the lease itself when it was presented to you to sign? A. Rudolph Cheramie took it in his hands
 
 and they had a piece of paper like this
 
 (witness illustrated),
 
 and Rudolph said it was for one year and that they would establish the boundary lines within sixty days.”
 
 Tr., p. 103. (Italics ours.)
 

 As there are no allegations in the petition that the fixing of boundaries was a part of the lease agreement, that part of the testimony was objected to and was excluded.
 

 (6) Besides, the testimony of Rudolph Cheramie, the interpreter for plaintiff, Jackson Cheramie, that he did not read and explain the lease to Jackson Cheramie is flatly contradicted by both Mr. Perkins and Mr. Ryan.
 

 The testimony of these two witnesses, Rudolph and Jackson Cheramie,
 
 that there was a paper or covering on any part of the lease
 
 was also positively denied by’ Mr. Ryan and Mr. Perkins.
 

 A lease dated June 13, 1936, by Theodore Cheramie, lessor, to D. W. O’Hern, lessee, was presented to Mr. Ryan. Tr., p. 44.
 

 
 *428
 
 This lease contains the same primary-term of ten years in paragraph 2, and also the same provisions in paragraph 4, as to deferred drilling for a period of twelve (12) months by.payment of rental, as are contained in the lease dated June 13, 1936, from plaintiff, Jackson Cheramie to defendant, N. A. -Moore. The two leases are identical in their- provisions. ,
 

 Mr. Ryan testified as follows:
 

 “Q.
 
 I show you a lease, dated June 13, 1936, by Theodore Cheramie, lessor, to D. W. O’Hern, lessee — could you identify this lease and the signatures on it? A. It is a lease where I was present when that was signed. D. W. O’Hern was a client of mine and that was made at the same time as the -other one. That is the one I had reference to where Joseph M. Perkins signed.
 

 “Q. Mr. Ryan, which one of these leases was executed first? A. Both within five minutes of one from the other, but I can’t answer which was executed first.” Tr., p. 119.
 

 The fact is that the O’Hern lease, dated June 13, 1936, was filed for recordation at 1:50 P. M. June IS, 1936, and the N. A. Moore lease, dated June 13, 1936, was filed for recordation June ISth at 1:45 P. M. Tr., pp. 38, 49.
 

 “Q. They were executed almost simultaneously? A. Yes, sir. I distinctly recall that one of these men turned to the other and spoke either in French or English and said that it was all right, and they both actually agreed, and then we made out the leases and they signed right there and then, but I could not say which one was first.
 

 “Q. What was the approximate length of the conversation, in time, before the leases were actually signed? A. As I recall it, on Saturday we discussed the thing at some length, and we returned the following day and I suppose it was an hour and a half or possibly two hours before we finally finished up.
 

 “Q. Was the lease read to the parties
 
 present? A.
 
 Yes. There was a great deal of reading and discussing at the time.
 

 “Q.
 
 Who read the lease? A. The interpreter read it. They had gone out and gotten Rudolph Cheramie.
 
 Not understanding French, I naturally don’t know what was read.
 

 “Q. At the time he had the lease in his hands and was reading it,
 
 was there any paper or covering on any part of the lease? A. No.
 
 He just handed it out to him.
 

 “Q. ' And you are positive that no part of the lease
 
 had a cover or rider over it, at the top of it? A. I am cértain of that.
 
 I had it in my hands and it was our property until it was signed.” Tr., pp. 119, 120. (Italics ours.)
 

 (7) Mr. Perkins testified as follows:
 

 “Q. Did you negotiate the lease of Jackson Cheramie to N. A. Moore, the lease under which this suit was brought? A. Yes, sir, I did.
 

 “Q. What, if any, representations
 
 did you make to Jackson Cheramie at the time the lease was obtained? A. None other
 
 *430
 
 than what are included in the lease itself, which were, $25.00 was paid at the time the lease was taken, known as bonus, and that within one year from the date of the lease either a well should be drilled ■on the property, or that a rental of $25.00 should be paid, known as a delay rental, which could perpetuate the lease for another year, for the ensuing year, following by like rentals being paid over like periods of time during the primary term of the lease. The delay rental was optional with Mr. Moore, he could either pay it or drop the lease.
 

 “Q. Did you promise to have the land covered by this lease surveyed or the boundaries established?
 
 A.
 
 No, I did not.
 

 “Q.
 
 Did you tell Mr. Jackson Cheramie, or any one else,
 
 that the lease was for a term of only one year?
 
 A.
 
 No.
 

 “Q.
 
 Did Mr., Rudolph Cheramie read the lease to Jackson Cheramie?
 
 A. I asked him to and
 
 he apparently did so in French.
 

 “Q. Was there
 
 a paper or a covering of any kind attached to the lease
 
 at the time it was handed to Mr. Rudolph Cheramie? A.
 
 No.
 

 “Q. There was no covering
 
 of any kind
 
 over any portion of the lease? A.
 
 None whatever.
 

 “Q.
 
 Was the lease read before it was signed? A. Yes, it was read
 
 at least once and probably two or three times, that is, each paragraph at a time, and the more important parts were thoroughly stressed.
 
 The lease was also passed around, the lease and two copies were passed from person to person,
 
 and I think nearly everybody around there
 
 handled it and many questions were asked,
 
 and it took nearly two hours
 
 to explain everything
 
 and get the correct description in the lease.” Tr., pp. 127, 128, 129. (Italics ours.)
 

 (8) Out of all the persons present, Jackson Cheramie, plaintiff, and his interpreter, Rudolph Cheramie, alone testify that the lease made to N. A. Moore had a cover on it down to the 4th paragraph of the lease, the option clause.
 

 In order to bolster up this contention, plaintiff attempted to show that there were indentations at the top of the lease, made by the wire clips at the top of the lease, and that the top of the paper of the lease was torn, when the top sheet was removed.
 

 In this attempt, plaintiff failed signally. The original N. A. Moore lease was handed to Mr. Perkins by counsel for defendants and identified by the witness. He was asked the following question:
 

 “Q. Now, I want you to examine this closely and tell me if you find any-pin holes, mutilations, or paste, imprints, indentations, or any acts of mutilation whatsoever on the top or anywhere else, or on any part of this lease? A. Other than
 
 two round holes, made evidently for filing purposes,
 
 I see no pin holes, mutilations of any kind, paste or mucilage, or indentations, or creases, on the lease.” Tr., p. 132. (Italics ours.)
 

 (9) Mr. Raoul Legendre, Chief Deputy Clerk of Court, was placed on the witness
 
 *432
 
 stand and shown the original N. A. Moore lease, and was asked
 
 to tell why the two holes appear in the top of the lease.
 

 The witness answered: “Well, I’ll explain this by saying: You will notice that all of these acts have the same kind of holes in the top, invariably so, the idea being that when these original records are received they are first filed on the daily record and afterwards recorded in the regulár records of the court, conveyance records, and the conveyance record and the page appear on the top, as you will see here — C.B.
 
 76,
 
 page 395 — for this particular record, this instrument, and the No. 31446. Now, after this is done, we have a regular file, which we call a Two Post File,
 
 and these holes are perforated at the top for the purpose of filing these instruments in their regular numerical order.
 
 Now, when this two post file is full we turn the instruments over to the printer or the bookbinder, and these original acts are then and there made up in regular book form, in a book about-this thick (witness indicated with his two hands).
 
 After these instruments are removed from our original file there are two holes left in the top, invariably so.
 

 “Q. The two holes which you refer to in the top part
 
 is the case with every act bound in that volume, is it not?
 
 A.
 
 Yes, sir.
 

 “Q. Now, I ask you to examine this particular instrument that I have referred to you and tell me if you find any mutilation, pin holes or indentations at the top, or anywhere else? A. I don’t seem to find
 
 any form of mutilation, other than the two holes that were made in the office.”
 
 Tr., pp. 141, 142. (Italics ours.)
 

 The existence of any rider or cover, either on the O’Hern lease or on the Moore lease, is emphatically denied by Mr.-Ryan and by Mr. Perkins, two credible witnesses, in the opinion of this court.
 

 Plaintiff, Jackson Cheramie, did not produce the original rider or cover in the district court, on the trial of this case. And plaintiff failed signally to prove the existence of such a paper by secondary, circumstantial evidence.
 

 The conclusion of the court is that the testimony of plaintiff and of his interpreter, as to the existence of such a document, is nothing short of a pure fabrication.
 

 Besides, the testimony of Mr. Perkins
 
 shows that two copies of the N. A. Moore lease, without riders on either of them, were handed to persons present, at the time of the negotiations as to the Moore lease;
 
 that the Moore lease'was read and explained by plaintiff’s' interpreter, before the lease was signed; that no statement was made by Mr. Perkins that the lease was for one year, as testified to by plaintiff, and his interpreter, and several of the witnesses for plaintiff; and that no promise was made by Mr. Perkins to have the boundaries of the lease established.
 

 (10) The plaintiff, Jackson Cheramie,
 
 testified thal a copy of the Moore lease was given to him in a short time after the lease was signed;
 
 that within several days after the execution of the lease it was read to him and he ascertained that the lease was for ten (10) years; and that thereafter he
 
 *434
 
 had a conversation with Mr. Perkins about the lease.
 

 “Q. Did you talk with the gentleman, whom you have identified as Mr. Moore (Mr. Perkins), about the terms of the lease, subsequent to, that is to say, sometime later about the duration of this lease? A. When?
 

 “Q., Say ten days after the time you signed the lease? A. He and I were alone and I asked him about it and I told him that there must be a mistake, because I had leased only for one year, but on the copy I had it stated that the lease was for ten years, but I don’t know whether he understood me or not.
 

 “Q. What did he say? A. He said
 
 he considered it all right.
 
 He said it was
 
 all right.
 

 “Q. Did he indicate to you that
 
 he would change it
 
 or fix it in any way ? A.
 
 No, sir. He just said it was alright.
 
 I didn’t have the lease with me. I spoke to him in French.
 

 “Q. But did you have the lease read to you later on and found out it was
 
 for ten years?
 
 A.
 
 Yes, sir.
 

 “Q. After you had signed the lease? A. Yes, sir.
 

 “Q. Who read it to you? A. Mrs. Harris Cheramie.
 

 “Q. How long after you had signed the lease did she read it to you? A. Maybe
 
 three, four or five days after,
 
 but I can’t say exactly.” Tr., pp. 105, 106.
 

 The Moore lease was signed by plaintiff, Jackson Cheramie, on June 13, 1936. Plaintiff knew on June 16th, 17th or 18th that the lease was for ten (10) years. He knew further that Mr. Perkins later said it was all right, and that there was no mistake about it. Plaintiff, Jackson Cheramie, on October 10, 1936, amended the lease made by him to N. A. Moore to change the description of the property but did not ask to have the lease changed to the term of one year. Tr., pp. 50 and 51.
 

 The present suit to annul the lease was not filed in the district court until October 10,
 
 1938.
 
 Tr., p. 10.
 

 (11) In his petition, Jackson Cheramie, plaintiff and lessor, alleges that he has accepted no rental monies or payments of any kind which would permit the deferring of drilling operations.
 

 As the lease in this case was not obtained by defendant, N. A. Moore, by any fraudulent representations of any kind, it is a legal and valid lease, of date June 13, 1936.
 

 Plaintiff was paid a bonus of $25, when the lease was executed.
 

 The option clause of the lease, paragraph 4, contains the following agreement between the lessor, Jackson Cheramie, and the lessee, N. A. Moore: “The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank,
 
 or for any reason fail or refuse to accept rental, Lessee shall not he held in default for failure to make such payment or tender of rental
 
 until thirty (30) days after Lessor shall deliver to
 
 *436
 
 Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders.” (Italics ours.)
 

 The lessor delivered no such instrument to the lessee in this case.
 

 It is also provided in the option clause, paragraph 4 of the lease: “If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties,
 
 unless on or before such anniversary date
 
 Lessee shall pay or tender to Lessor or to the credit of Lessor in Citizens Bank and Trust Co. Bank at Cut Off, La.,
 
 (which bank and its successors are Lessor’s agent
 
 and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Twenty-five and no/100 Dollars ($25.00), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term.” (Italics ours.)
 

 The lease being a legal and valid one, the provisions of paragraph 4 of the lease were binding upon the lessor, Jackson Cheramie, and upon the Citizens Bank & Trust Company at Cut Off, La., agent for the lessor, to receive and accept the rentals in this case, tendered to the bank on or before the anniversary date for the years 1937 and 1938.
 

 . Payment of rentals was made by N. A. Moore, lessee, of $25 each before the first and second anniversaries of the rental payment set out in the lease. On May 24, 1937, and May 4, 1938, the rental payments were credited to the account of lessor by the Citizens Bank & Trust Company at Cut Off, La., agent of lessor, who was notified by the bank that the payments had been received and placed to his credit as rentals, in accordance with the terms of the lease. Plaintiff had full knowledge of the deposits of the rentals to his account in the Citizens Bank & Trust Company of Cut Off, La., the agent of plaintiff, the lessor. Plaintiff thereafter drew checks against his account.
 

 Mr. O. B. Ducos, manager of the Citizens Bank & Trust Company, Cut Off, La., a witness for defendant, N. A. Moore, lessee, identified the deposits made by him, under the rental provisions of the lease in question, and testified to their having been drawn out by Jackson Cheramie, lessor, who was notified of each deposit when it was made. Tr., pp. 113, 114, 115, 116, 117.
 

 It is true that Jackson Cheramie, lessor, asked the bank not to take the two anniversary deposits for rentals, and stated that he did not want the money; but he was informed by the bank that it could not do that, that the bank had to take the deposits. Cross-examination of Ducos, manager of bank, Tr., p. 117.
 

 Under the rental payment agreement of the lease, Jackson Cheramie, lessor, was bound to accept the deposits, timely made, and the bank, likewise, was bound to receive them.
 

 The lease of date June 13, 1936, duly recorded June, 15, 1936, was a legal and
 
 *438
 
 valid lease when the two anniversary payments were tendered to the bank. There had been no breach of any of its conditions before either of the deposits was tendered and received. '
 

 We find no error in the judgment appealed from by plaintiff.
 

 Judgment affirmed.
 

 ROGERS, J., not having heard the argument, takes no part.