John L. MORRISON, Walter C. Morrison, Edna Elizabeth Morrison Scatterty, Carolyn Ann Scatterty Gonzales, Camille Scatterty Noblr, and Farnham L. Morrison

v.

CONOCO, INC., Banner Petroleum Ltd., J. Hiram Moore, Ltd., the Olin Corporation and Moran Exploration, Inc.

Civ. A. No. 82–187–A.

United States District Court, M.D. Louisiana.

Oct. 6, 1983.

---

Edwin W. Edwards, and Stephen R. Edwards, Baton Rouge, La., George Hardy, Lafayette, La., and John R. Schupp, New Orleans, La., for plaintiffs.

Robert T. Jorden, James L. Pelletier, Lawrence P. Simon, Jr., Paul B. David, Lafayette, La., for defendants.

JOHN V. PARKER, Chief Judge.

In this diversity action, plaintiffs seek partial cancellation of an oil, gas and mineral lease, and also seek damages from defendants for failing to protect the leased premises from drainage. Defendants have filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. After some false starts, both sides have submitted briefs to the court, and the court finds that no oral argument is required.

The following facts are undisputed:

1) On May 31, 1976, W.C. Morrison, Inc. granted an oil, gas and mineral lease to Walter H. White, III, covering 632 acres more or less in sections 14, 15, 27, 28 and 29, Township 4 South, Range 9 East, Pointe Coupee Parish, Louisiana.

2) On March 24, 1980, plaintiffs acquired all right, title and interest in the land and the mineral interests covered by the subject lease.

3) By Order No. 1063 dated May 10, 1979, effective May 1, 1979, the Commissioner of Conservation for the state of Louisiana created a drilling and production unit for the 18,100' Tuscaloosa Sand, Reservoir A, Sand Unit B, which includes 7.327 acres of the leased property. The remaining 624.637 acres covered by the lease has not been drilled and has not been included in any unit. The unit established by the Commissioner was redefined by Order No. 1063–A–3, effective January 13, 1982, but the acreage covered by the lease was not affected.

4) Production in paying quantities was established on the unitized acreage on January 1, 1981, and has continued until date.

5) The printed form of the lease is the familiar "unless" form under which the lease shall terminate on a specific date unless on or before that date the lessee either commences operations for drilling or pays delay rentals. Delay rentals in the

amount of $15.00 per acre are specified in the lease, which has a primary term of five years from May 31, 1976.

6) Royalty payments on the production presently are being paid timely to plaintiffs; formerly they were paid to their predecessor in title.

7) Delay rental payments in the amount of $9,481.00 were deposited timely to the depository bank to the credit of the original lessor on April 26, 1977; March 28, 1978; May 10, 1979; and April 3, 1980, respectively, covering the delay rental periods from May 31, 1977, through May 31, 1981.

8) A shut-in royalty payment in the amount of $110.91 on the unitized acreage was deposited timely in the depository bank to the credit of the original lessor on August 27, 1980.

9) "Pugh clause" rental payments in the amount of $9,371.00 were deposited timely to the depository bank to the credit of the original lessor on August 28, 1980.

10) A "Pugh clause" rental payment in the amount of $9,371.20 relating to the non-unitized acreage covered by the lease was deposited timely in the depository bank to the credit of plaintiffs on April 10, 1981, for the period of May 31, 1981, to May 31, 1982.

11) A "Pugh clause" rental payment in the amount of $9,371.20 relating to the non-unitized acreage covered by the lease was deposited timely in the depository bank to the credit of plaintiffs on April 12, 1982, for the period from May 31, 1982, to May 31, 1983.

12) The printed lease contains a rider identified as Exhibit A which is typewritten. Exhibit A reads, in part, as follows:

15. The following provisions are made part of the above identified Oil, Gas and Mineral Lease to which this Exhibit "A" is attached and, in the event of conflict, said following provisions shall control over any of the printed provisions appearing in said lease:

\*　　\*　　\*　　\*　　\*　　\*

(b) Lessee shall be obligated to reasonably and adequately develop the oil and gas in and under such leased premises and shall drill such offset wells and conduct such operations as would a reasonably prudent operator to prevent the drainage of the leased premises from wells and operations respectively drilled or conducted upon or in land situated without the limits of the leased premises.

13) On November 11, 1981, counsel for plaintiffs communicated with Conoco, one of the defendants, quoting Paragraph 15(b) of Exhibit "A" and further stating, in part:

In addition to this specific covenant, the jurisprudence of this state has long required Lessees to reasonably and adequately develop leased premises. The Lessee's obligation to do so under the jurisprudence is strengthened by the express provisions of Sub-section (b) in Paragraph 15 of Exhibit "A".

Reasonable and prudent exploration and development policies would call for the drilling of at least one additional well on that portion of the property not now included in an oil, gas and mineral producing unit, looking for the full development of the premises and the production of oil, gas and other minerals in paying quantities from that portion of the premises not now subject to production of minerals. Therefore, in accordance with the provisions of Paragraph 11 of the lease, demand is herewith made upon you for full compliance within sixty (60) days following receipt hereof.

14) On November 18, 1981, Conoco replied, acknowledging receipt of counsel's letter "regarding further development of the subject oil and gas lease" and stating that it was "reviewing the situation."

15) On November 25, 1981, Conoco again communicated with counsel for plaintiffs, noting that a well presently was being drilled on the unit directly to the east of the unit containing part of the Morrison lease and suggesting that the results of that well ought to be evaluated before making any decision relative to further development on the Morrison tract.

16) On January 11, 1982, counsel for plaintiffs called upon Conoco to release all of that portion of the property not included in the unit, claiming inadequate development of the property.

17) Conoco and the other defendants failed to submit a recordable release; this suit followed.

18) Paragraph 14 of the lease provides, in part, that if any portion of the lease should be unitized with other land, then:

> ... production from any unit shall only maintain this lease as to the land included in such unit ... When this Lease is being maintained by operations or production as ... provided for as to the land in a unit or units, the lease may also be maintained as to all or any part of the land not included in any such unit or units by payment of that proportion of the rentals attributable on an acreage basis to such land; ... and Lessee's rights hereunder may be so maintained by rental payments during and for five years after the end of the primary term...."

■ Plaintiffs entire claim for cancellation of the lease on that portion of the property not included within the production unit is predicated upon the notion that the typewritten paragraph of the lease requiring the lessee to "reasonably and adequately develop" the lease is in conflict with and takes precedent over the printed Paragraph 14 authorizing payment of "Pugh clause" delay rentals for that portion of the lease not included in the unit.

In Louisiana, the courts have consistently imposed an implied obligation upon the lessee to develop and operate the property in the manner of a reasonable, prudent operator. *Carter v. Arkansas Louisiana Gas Co.*, 213 La. 1028, 36 So.2d 26 (1948); *Caddo Oil & Mining Co. v. Producers' Oil Co.*, 134 La. 701, 64 So. 684 (1914); *Vetter v. Morrow*, 361 So.2d 898 (La.App. 2d Cir. 1978). That implied obligation has now become express by incorporation into article 122 of the Mineral Code, LSA–R.S. 31:122, which reads as follows:

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

The Mineral Code was effective January 1, 1975; and this lease, having been executed in May, 1976, falls within the coverage of all of its provisions. Article 3 of the Mineral Code expressly recognizes that individuals may renounce or modify whatever has been established in their favor by the provisions of the Code provided it does not effect the rights of others and it is not contrary to the public good.

Thus, it is clear that the lessee under this mineral lease had the obligation to develop and operate the property as a reasonably prudent operator for the mutual benefit of himself and the lessor, even had the lease itself been silent upon that subject. Plaintiffs argue, however, that typing the obligation to reasonably and adequately develop into the lease itself somehow raises the status of that obligation and makes it more onerous than it otherwise would be. Plaintiffs, in brief, concede that if this were a "typical" mineral lease, then the "Pugh clause" delay rentals admittedly paid by defendants would operate to maintain the lease on the non-unitized acreage.

Article 114 of the Mineral Code incorporates the holding of *Hunter Co. v. Shell Oil Co.*, 211 La. 893, 31 So.2d 10 (1947), that operations either on the leased premises or on land unitized therewith will preserve the lease as to its entirety. The so-called "Pugh clause" of which Paragraph 14 of this lease is a typical example, represents an effort by landowners to avoid the application of the *Hunter* case. "Pugh clauses" come in a bewildering variety of detail, *see* Comment, *The Effect of Unitization on the Duration and Extent of Mineral Interests in Louisiana*, 36 Tul. L.Rev. 769, 791–795, but all basically provide that production from a unit including a

portion of the leased property will maintain the lease only as to the property included within the unit. A modification in favor of the oil companies has been the additional provision which allows the lessee to maintain the lease in effect on the non-unitized acreage by paying delay rentals or by other stipulated action. *Fremaux v. Buie*, 212 So.2d 148 (La.App. 3d Cir.1968); *see* Moses, *Some Comments on the "Pugh Clause" in Louisiana Oil and Gas Leases*, 37 Tul.L. Rev. 269, 272.

Plaintiffs cite no authority for their assertion that the simple act of typewriting a provision for adequate development of the leased property somehow raises that obligation to a status above the obligation imposed by article 122 of the Mineral Code, which is the same obligation that has been imposed consistently by the Louisiana jurisprudence. The court has found no authority to support that proposition. On the contrary, I conclude that simply adding a provision to a contract, where that condition is already imposed by law, does not add to the obligation. The parties are, of course, free under article 3 of the Mineral Code to contract in any manner that they wish, but the typewritten development clause added to this lease is in no way different from the implied obligation of Louisiana jurisprudence or the statutory obligation incorporated in article 122. While I have not found a case specifically on point, *Wier v. Grubb*, 228 La. 254, 82 So.2d 1 (1955) involved a similar situation. In that case, the parties had, as here, added a specific typewritten development clause to the lease. The lessor filed suit for cancellation of the lease because of failure to properly develop. The court commented:

> Here was a specific and express obligation to diligently prosecute the development of the entire area herein leased. Even in the absence of such an expressed provision, our law imposes upon a lessee the implied obligation of reasonable development of the entire area. 82 So.2d at 5.

Following that quote, the supreme court then proceeded to discuss the several implied obligation cases in Louisiana jurisprudence and applied the obligation as formulated in those cases to the facts of the *Wier v. Grubb* case. That case clearly indicates that incorporation of such a development clause into the lease adds nothing to the obligations already imposed by law, absent some clear departure from the existing implied obligation and reduced by the parties to writing. The typewritten development clause in this lease is no way contrary to the obligation imposed by article 122 and adds no additional burden upon the lessee. Under those circumstances, this lease is in all respects a "typical" lease containing a "Pugh clause." The lessee has exercised its privilege under the "Pugh clause" to pay delay rentals as an alternative to further development of the property, and the undisputed facts disclose that the defendants are entitled to judgment on this score, as a matter of law.

■ An interesting question not advanced by plaintiffs is that, so far as our research has disclosed, no Louisiana court has yet specifically held that payment of delay rentals under a "Pugh clause" will substitute for further development of the lease on the acreage outside the unit, although two federal courts sitting in Louisiana have held that failure to pay Pugh clause delay rentals will forfeit the lease. See *Broussard v. Phillips Petroleum Co.*, 160 F.Supp. 905 (W.D.La.1958) aff'd per curiam 265 F.2d 221 (5th Cir.1959); *Smith v. Carter Oil Co.*, 104 F.Supp. 463 (W.D. La.1952). The court in *Lejeune v. Superior Oil Co.*, 315 So.2d 415 (La.App. 3d Cir. 1975) was confronted with a situation similar to that before this court. There a production unit had been formed which included a portion of the leased acreage and the lessee had promptly made delay rentals under the authority of a "Pugh clause." Plaintiffs contended that the non-unitized portion of the lease should be cancelled, despite the payment of "Pugh clause" delay rentals because the lessee's obligation to develop the property required it. The court discussed the evidence on the merits of the case and concluded that plaintiffs

had failed to prove that the lessee had not fully developed and explored the property and commented, "It is unnecessary for us to consider defendants' contention that payment of Pugh clause rentals relieved them of those obligations." 315 So.2d at 418. Thus, the question of whether the obligation to develop the property can be substituted by payment of "Pugh clause" delay rentals was left unanswered, at least by the Court of Appeal for the Third Circuit. That case has been criticized, the commentator noting that the very purpose of a "Pugh clause" delay rental is to permit the lessee to defer further development. *See* McCollam *A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code,* 52 Tul.L.Rev. 729, 805, n. 505. It is certainly established in Louisiana jurisprudence that a mineral lessee's rights can be fully maintained during the primary term of the lease by payment of delay rentals without drilling operations. *Cheramie v. Moore,* 194 La. 415, 193 So. 692 (1940); *Fomby v. Columbia County Development Co.,* 155 La. 705, 99 So. 537 (1924); *Leonard v. Busch-Everett Co.,* 139 La. 1099, 72 So. 749 (1916); *Saunders v. Busch-Everett Co.,* 138 La. 1049, 71 So. 153 (1916). There is nothing inconsistent in allowing the mineral lessee to defer drilling by paying delay rentals during the primary term and allowing the mineral lessee to defer further development after production, by paying "Pugh clause" delay rentals for the limited period established by the contract. (In this case five years following the primary term). As noted, the question is interesting but since plaintiffs have not raised the issue there is no need to resolve it.

Plaintiffs' claim for money damages because of the lessee's failure to prevent drainage is barred because the lessee has not been put in default as required by articles 135 and 136 of the Mineral Code. Plaintiffs concede that a putting in default is necessary prior to the assertion of an action for damages because of failure to prevent drainage but argue that the correspondence of counsel quoted above has satisfied that requirement.

It is significant that the letter dated November 11, 1981, makes no complaint regarding drainage and does not place the lessee on notice that any drainage claim is being asserted. Counsel did quote the entirety of sub-section (b) of Exhibit "A" which covers both further development and drainage; and if counsel had ended the letter at the end of the quotation, the letter might be construed as asserting a claim for both further development and drainage. The remainder of the letter, however, goes further and makes only a specific claim for additional development. It is also apparent that Conoco was wholly ignorant of any claim for drainage because its letters dated November 18, 1981, and November 25, 1981, make specific reference only to the claim "regarding further development."

For these reasons, the motion for summary judgment will be GRANTED. The claim for cancellation of the lease will be DISMISSED and the claim for damages for failure to prevent drainage will be DISMISSED without prejudice.