**Florel Christie ROUGON and Joseph Aubin Rougon**

v.

**CHEVRON, U.S.A. INC.**

**Civ. A. No. 83–198–A.**

United States District Court, M.D. Louisiana.

Oct. 26, 1983.

Charles W. Sartain, McCollister, McCleary, Fazio & Holliday, Baton Rouge, La., for plaintiffs.

M. Hampton Carver, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for defendant.

JOHN V. PARKER, Chief Judge.

This matter is before the court on a motion to remand filed on behalf of plaintiffs and on cross motions for summary judgment. Each side has presented its position on the cross motions for summary judgment in oral arguments and by supplemental briefs. No further oral argument is necessary.

This diversity action seeks cancellation of an oil and gas lease to the extent of plaintiffs' seven-ninths ownership of the land, insofar as it covers land not within the boundaries of producing units. Chevron has counterclaimed for judgment extending the lease during the period of time of this litigation.

The following facts are undisputed:

1) The defendant, Chevron U.S.A. Inc., is a California corporation with its principal place of business in San Francisco, licensed to do and doing business in the State of Louisiana, which has its principal Louisiana business in the Parish of Orleans.

2) On September 21, 1972, the Succession of Charles Aubin Rougon, represented by petitioner, Florel Christie Rougon, Testamentary Executrix, granted an oil, gas and mineral lease to Chevron Oil Company covering and affecting certain tracts of land in Pointe Coupee Parish, Louisiana. A complete description of the lands covered thereby is included in the lease, a copy of which has been filed in the record.

3) The petitioners herein are the surviving spouse and child of the deceased, Charles Aubin Rougon, are citizens of Louisiana and were sent into possession of an undivided five-ninths and an undivided two-ninths respectively of the lands which are the subject of this petition, by Judgment of Possession rendered in the proceedings styled "In the Matter of the Succession of Charles Aubin Rougon," being Docket Number 10,131 of the 18th Judicial District Court, of the Parish of Pointe Coupee, Louisiana.

4) Defendant, Chevron U.S.A. Inc., is the successor in the interest of the original lessee, Chevron Oil Company, pursuant to a Declaration of Corporate Name, recorded at COB 137, Entry Number 184, records of Pointe Coupee Parish, Louisiana.

5) The Lease was for a primary term of 10 years from the date of its execution, and contained a clause commonly referred to in the oil industry as a "Pugh clause" which reads as follows:

Notwithstanding anything to the contrary contained, drilling operations on or production from a pooled unit or units established under the provisions of paragraph 2 hereof or otherwise embracing land covered hereby and other land shall maintain this lease in force only as to land included in such unit or units. The lease may be maintained in force as to the remainder of the land in any manner herein provided for, provided that if it be by rental payment, rentals shall be payable only on the number of acres not included in such unit or units. If at the end of or after the primary term this lease is being maintained as to a part of the land by operations on or production from a pooled unit or units embracing land covered hereby and other land, Lessee shall have the right to maintain this lease as to the land not included in such unit or units by rental payment exactly as if it were during the primary term, only on the number of acres not included in such unit or units, provided that this right to pay rental shall terminate two (2) years after the end of the primary term. During any period which Lessee is maintaining this lease in accordance with the provisions of this paragraph, Lessee shall not be relieved of his obligation to develop the leased premises with reasonable diligence and protect the lines of the leased premises as provided herein. In no event shall any duplicate payment of rental be required hereunder in order to maintain this lease as to any portion of the leased land.

6) By a number of orders the Commissioner of Conservation of the State of Louisiana created a series of drilling and producing units for Reservoir A of the Upper and Lower Tuscaloosa Sands in the Judge

Digby Field, Pointe Coupee Parish, Louisiana. Sand Units, A, B, D and G created thereby, included 970 acres, more or less of the lease.

7) Commencing at various times during the primary term of the lease but after January 1, 1975, the defendant obtained or caused to be obtained, production of natural gas and condensate from wells situated in the sand units described in paragraph 6 above. An undivided portion of such production from each well is attributed to that part of the lands covered by the lease which are included in those drilling and producing units.

8) On September 17, 1982, Chevron tendered the rentals required by the "Pugh clause" to maintain the leases as to the lands not included in the aforesaid units. The tender was refused and Chevron's check returned.

9) This suit was filed originally in state court on February 7, 1983. On February 22, 1983, defendant removed the action to this court.

Plaintiffs now contend that the case should be remanded to state court because the amount in controversy is less than $10,000.00, thus depriving this court of subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiffs argue that the amount in dispute should be determined by looking to the amount of "Pugh clause" rentals which would be paid were the lease not cancelled. That amount, according to plaintiffs, is $9,330.00.

Plaintiffs' object in bringing this action is not to collect "Pugh clause" rentals which they had already declined to accept; it is rather to cancel the lease on that land not within producing units. The amount in dispute is the lease value of plaintiffs' land if it were unencumbered by the Chevron lease. *See, Perrin v. Tenneco Oil Company,* 505 F.Supp. 23 (W.D.Okl.1980). According to defendant's affidavit, a new lease could bring as much as $100,000.00, and it is *that* amount which is in controversy.

Defendant, having properly removed this action to federal court, is clearly entitled to stay in federal court, although the issues presented, involving previously undecided matters of Louisiana mineral law, are peculiarly suited to disposition by the state courts of Louisiana. A federal court having jurisdiction must, however, adhere to the dictates of *Erie* and, donning the robe of a Louisiana judge, proceed to dispose of the cross motions for summary judgment as though this were a state court of Louisiana.

Plaintiffs move for summary judgment, arguing that the "Pugh clause" divided the lease into two portions—the unitized acreage and the outside acreage. They contend that the terms of the "Pugh clause" in the lease authorizing Chevron to extend the term of the lease to twelve years contravenes the provisions of article 115 of the Louisiana Mineral Code. Thus, they argue that the lease terminated on September 21, 1982, the last day of the primary term, as to acreage under lease which was not within the boundaries of any producing unit.

Defendant responds that the lease provides merely for the effect of unit operations on this particular leasehold. Were it not for the existence of the "Pugh clause," defendant argues, unit operations would serve to maintain the lease in its entirety—a situation not offensive under article 115. Defendant maintains that the lease is valid and should be given effect. Additionally, defendant claims it is entitled to an extension of the lease insofar as it affects the outside acreage to compensate for the period of time lost because of this litigation.

Although the issue presented in plaintiffs' argument is res nova, it is not without precedent. The explanation for this seeming contradiction lies in the history of the development of the Louisiana Mineral Code.

Louisiana by statute grants extensive powers over mineral development to its Commissioner of Conservation. The provisions of Act 157 of 1940 (now contained in La.R.S. 30:1 et seq.) grant the Commission-

er authority to limit the number and to prescribe the location of all wells drilled and to establish drilling and production units without regard to property lines or areas included within leases. *See* La.R.S. 30:4, 9 and 10. Section 10A(1)(a) provides that all orders requiring pooling shall afford the owner of each tract the opportunity to recover or receive his "just and equitable share of the oil and gas in the pool" and subsection (b) provides:

> The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon.

Each pooling order issued by the Commissioner contains a provision declaring that each tract shall share in unit production in the proportion that acreage of the tract bears to the entire acreage of the unit in which it is situated and further, that all operations on and production from each unit shall suffice as operations on and production from each of the separate leaseholds within that unit. The delegation of such powers and the inclusion of such language in unit orders has been sustained by the Supreme Court of Louisiana. *See Crichton v. Lee*, 209 La. 561, 25 So.2d 229 (1946) and by the Supreme Court of the United States, *see Hunter Co. v. McHugh*, 320 U.S. 222, 64 S.Ct. 19, 88 L.Ed. 5 (1943).

■ Absent the problems created by units, the most simple situation is where a well is drilled on the leased property; under Louisiana law, that well, no matter where it is located on the leasehold, maintains the leased acreage in its entirety. *See, e.g.*, Moses, *The Evolution of the Oil, Gas and Mineral Lease*, 22 Tul.L.Rev. 471 (1948).

■ This simple situation is complicated by the creation of units which encompass acreage comprised of portions of several different leaseholds. The landmark decision of *Hunter Co. v. Shell Oil Co.*, 211 La. 893, 31 So.2d 10 (1947) held that unit orders of the Commissioner do not "divide" the mineral lease and established the proposition that operations either on the leased acreage or on lands unitized with it serve to maintain the lease in its entirety. *See also, LeBlanc v. Danciger Oil & Refining Co.*, 218 La. 463, 49 So.2d 855 (1950). Whether the unit covers the entire lease or part is irrelevant. *Hunter, supra*, explains that even when the unit well is drilled on someone else's land, the lessor receives "the same revenue as he would have received if the well had been located on his lands, and that the lessor of any particular tract could receive no more even if the well were drilled on the land covered by his lease." 31 So.2d at 13. Because a lessor's share of unit production remains the same no matter where within the unit the well is located, there is no logical reason to make a distinction between a well located on or off the lease as long as some part of the lease is within the unit. Hence production from a well anywhere within a unit during the primary term of a lease maintains all leases included in whole or in part in the unit beyond the primary term. *Id.* The holding of *Hunter* is now part of the Mineral Code of Louisiana: "... [O]perations on the land burdened by the lease or on land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened." La.R.S. 31:114.

It is at this point that the "Pugh clause" appears:

> The so-called "Pugh clause" ... represents an effort by landowners to avoid the application of the *Hunter* case. "Pugh clauses" come in a bewildering variety of detail, *see* Comment, *The Effect of Unitization of the Duration and Extent of Mineral Interests in Louisiana*, 36 Tul.L.Rev. 769, 791–795, but all basically provide that production from a unit including a portion of the leased property will maintain the lease only as to the property included within the unit. A modification in favor of the oil companies has been the additional provision which allows the lessee to maintain the lease in effect on the non-unitized acreage by paying delay rentals or by other

stipulated action. *Fremaux v. Buie*, 212 So.2d 148 (La.App.3d Cir.1968); see Moses, *Some Comments on the "Pugh Clause" in Louisiana Oil and Gas Leases,* 37 Tul.L.Rev. 269, 272. *Morrison v. Conoco, Inc.,* 575 F.Supp. 876 (M.D.La.1983).

■ Thus the parties to a contract of lease fall under the strictures of *Hunter v. Shell Oil Co.,* (now Article 114)—"operations on the land burdened by the lease or on land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened"—unless they contract otherwise. As the comment to article 114 notes:

Under Article 3 parties are free to provide for a result other than that contemplated by Article 114. This is frequently done by the inclusion of a "Pugh clause" in the lease, which effectively reverses the Hunter and LeBlanc decisions, with the result that if there is a unitization and production is obtained from the unit, the lease is maintained only as to that portion in the unit.

The last chapter in this saga of Louisiana mineral law does not follow from the line of jurisprudence which spawned the "Pugh clause," but rather meets it head-on, according to plaintiffs. Following article 114's codification of the *Hunter, LeBlanc* rule and article 3's permission to freely contract to the contrary, comes article 115's proscription against dismemberment of title and the potential avoidance of the prescriptive rules applicable to servitudes (ten-year non-use). Under article 115, a "lease is not subject to the prescription of non-use, but the lease must have a term; ... a lease shall not be continued for a period of more than ten years without drilling or mining operations or production."

According to the comment to article 115, this rule is a matter of public policy.[1] *See also Wemple v. Nabors Oil & Gas Co.,* 154 La. 483, 97 So. 666 (1923) (discussion of public policy concerns of avoiding fragmentation of titles and keeping property in commerce).

Article 115 is probably the result of a compromise:

In *Reagan v. Murphy,* 235 La. 529, 105 So.2d 210 (1958), the court held that a mineral lease, unlike a mineral servitude or a mineral royalty interest, was subject to neither the 10-year liberative prescription nor the contiguity rule established with respect to servitudes in *Lee v. Giauque,* 154 La. 491, 97 So. 669 (1923) [*See* La.R.S. 31:63–64, 79 (1975)] [Article 115 limits the primary term of a lease to ten years.]

.        .        .        .        .

The purpose for the limitation, which is a compromise between the Reagan no-prescription rule and the full application of the prescriptive rule which pertains to other mineral rights, is to prevent dismemberment of title and potential circumvention of the servitude rule by the creation of retention of a paid-up mineral lease having a primary term in excess of 10 years. McCollam, *A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code,* 50 Tul.L.Rev. 732, 785–86 (1976).

■ It is correct that a mineral lease may not have a term for a period longer than ten years. La.R.S. 31:115. It is also correct that the lease may be maintained for longer than ten years by production from either a well on the leased acreage or from one on acreage unitized with the leased tract. La.R.S. 31:114. The lease contract before the court alters that rule and provides instead that unit operations

---

**1.** Chevron argues that since this 1972 lease was entered prior to the January 1, 1975, effective date of the Mineral Code, no provision therein may divest it of vested rights. Plaintiffs argue that Article 214 establishes the public policy of Louisiana that the Code shall apply so far as constitutionally permissible to all mineral rights existing on the effective date and, further, that

application of article 115's limitation does not divest defendant of any vested right because it had from 1975 to 1982 to complete operations necessary to extend the entire lease beyond the primary term. Because of the conclusion reached in this case, it is not necessary for this federal court to address those issues.

will maintain the lease only as to the area in the unit. Further, the lessee may maintain the lease on the area outside the unit by delay rentals for two years beyond the primary term. After twelve years, there must be operations on the actual acreage under lease to maintain the non-unitized portions. This clause makes the lessee's burden more onerous, not less. Without it, production from any part of the unit would maintain the lease in its entirety beyond the primary term without the payment of any delay rentals whatsoever. The entire lease could be maintained solely by production from the unit well indefinitely, so long as there was production, (pretermitting any consideration of the lessee's duty to explore and develop the property. La.R.S. 31:122); and the lease would not be limited to two years beyond the primary term as the "Pugh clause" does here. It is clear that such an extension does not violate Louisiana's public policy. *Hunter v. Shell Oil Co., supra;* La.R.S. 31:115. Since Louisiana's public policy allows extensions of the entire lease beyond the primary term indefinitely—so long as oil or gas is produced from a unit well whether located on or off the leased tract, and without payment to the lessor of any sum in addition to his share of production—how can it be said that public policy is violated by a contractual provision which requires the lessee to pay an additional sum on all land located outside the unit and restricts the length of the delay rental extension to two years? It appears to me that such a provision furthers Louisiana's public policy by providing revenue to the lessor that he would not otherwise have and by encouraging the lessee to develop or release leased land located outside of units. The conclusion is inescapable that this "Pugh clause" does not violate article 115 of the Mineral Code (assuming its constitutional application to this lease), that it is valid in every respect and that Chevron has the option of extending the lease for a period of two years beyond the primary term by timely payment of delay rentals.

It follows that Chevron's motion for summary judgment must be granted and that plaintiffs' motion must be denied.

The court finds defendant's claim that it is entitled to an extension of the lease insofar as it affects the outside acreage is sound:

It is true ... that according to established Louisiana jurisprudence, where a lessor questions the validity of a lease, the term of the lease is suspended, the logic being that the lessee has been deprived of the exercise of the rights granted to him by the lease by the act of the lessor and he is therefore granted an extension beyond the primary term for the period during the primary term when the lease was placed in jeopardy. (Emphasis omitted) *Hanszen v. Cocke,* 246 So.2d 200, 203 (La.App. 1st Cir.1971). *See also Pennington v. Colonial Pipeline Company,* 400 F.2d 122 (5th Cir. 1968); *Baker v. Potter,* 223 La. 274, 65 So.2d 598 (1952).

Defendant therefore is entitled to have the term of the lease suspended from February 7, 1983, the date suit was filed, until such time as judgment in this action shall become final.

Accordingly, the motions for summary judgment and for remand filed on behalf of plaintiffs are hereby DENIED; and the motion for summary judgment filed on behalf of defendant is hereby GRANTED; and this action will be DISMISSED.