737 So.2d 1257 (1999)
Mattie Connell CASKEY, et al.
v.
KELLY OIL COMPANY, et al.
No. 98-C-1193.
Supreme Court of Louisiana.
June 29, 1999.
*1259 Scott C. Sinclair, Shreveport, Thomas A. Harrell, Baton Rouge, Counsel for Applicant.
James M. Johnson, Donald Frank Bright, Counsel for Respondent.
LEMMON, Justice.[*]
This is an action by the mineral lessors of a 140-acre tract against one of their colessees to enjoin the co-lessee's use of a road on the leased premises and to recover various damages. The issue before this court is whether the co-lessee, under the "adjacent lands" clause in the mineral lease, may improve and use an existing road on the leased premises to conduct mineral operations on adjacent land not owned by the lessors, without having to prove that the lessors will receive some benefit from the co-lessee's use of the road and subject only to the requirement of La.Rev.Stat. 31:11 that the co-lessee exercise its rights with "reasonable regard" for the rights of the lessors.

Facts
In 1972, the three plaintiffs and their predecessors in title granted an oil, gas and mineral lease covering 140 acres in Webster Parish known as the Connell tract. The granting clause of the Connell lease provided, in pertinent part:
Lessor ... hereby grants, leases and lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any operations conducted by Lessee thereon, or on any adjacent lands, the following described land in Webster Parish....
The original lessee assigned a substantial interest in the lease to a company that successfully completed a well on the leased premises. Thereafter, there were further assignments, and at the time of trial all of the lessee's interest was owned by Sonat Exploration and by defendant Kelley Oil Corporation,[1] a co-lessee who owned a 25.66% interest in the lease.
Since the inception of the lease, the colessees and their predecessor lessees, through various operators, have obtained production from wells on the Connell tract. By agreement of the co-lessees, Sonat has acted as operator of the wells on the Connell tract, but Kelley, although a co-lessee, has never acted as operator.
In the 1980s, Kelley's predecessors completed a well on the Seamster tract, which is south of and immediately adjacent to the Connell tract. To gain ingress and egress to drill and to operate the Seamster well, Kelley's predecessors used an existing unimproved north-south road on the Connell tract that had been used by previous operators of the Connell wells.
Kelley became the operator of the Seamster well about 1988. Kelley's personnel began entering the Connell tract through a locked gate on the Connell tract's north boundary and using the same road used by its predecessors to gain ingress and egress to the Seamster well on the adjacent land south of the Connell *1260 tract. Although Kelley's personnel allegedly often neglected to secure the gate, plaintiffs never objected to use of the road by Kelley and its agents to obtain access to the Seamster well.
In the summer of 1996, Kelley, through a contract operator, undertook to drill a well on the Crichton tract, which also is located south of and immediately adjacent to the Connell tract. After investigating and rejecting other potential routes to the well site, Kelley directed its operator for the Crichton well to improve the road on the Connell tract. Thereafter, the operator, without seeking the permission of the lessors, temporarily removed the locked gate, improved the ditches and removed small timber alongside the road, and laid a shale surface over the roadway. As a result of the improvements, a high quality oilfield road now traverses the entire Connell tract in a north-south direction and permits direct access to the Crichton tract.
Plaintiffs filed this action to enjoin Kelley and its contract operator from using the surface of the Connell tract for access to its operations on the Crichton tract and to recover damages. After a hearing, the trial court denied a preliminary injunction, reasoning that Kelley had the right, under the clear and unambiguous "adjacent lands" clause in the Connell lease, to construct roads to further its mineral operations on any adjacent lands. The court further held that Kelley's conduct, although "brash and uncivil," was not unreasonable under Article 11 of the Mineral Code.[2]
Thereafter, the parties submitted the permanent injunction on the record, and the trial court rendered judgment denying the permanent injunction and awarding plaintiffs the stipulated sum of $3,199.25 for the timber damages and damage to the land. The court ruled in favor of defendants on all other claims, including plaintiffs' claim for damages for trespass.
The court of appeal reversed and rendered judgment permanently enjoining defendants and their agents from committing any further acts of trespass on the Connell tract. 30,278 (La.App.2d Cir.2/25/98), 706 So.2d 1102. The court reasoned that Article 122 of the Mineral Code[3] imposes an obligation upon the mineral lessee to operate the leased property for the mutual benefit of the parties to the lease, and while that obligation can be contractually defined, the public policy underlying the obligation cannot be abrogated. 30,278 at p. 5, 706 So.2d at 1105. The court concluded that Kelley failed to prove a benefit accruing to the lessors from Kelley's use of the surface of the leased premises to conduct operations on adjacent lands.
As to reasonableness, the court opined that use of the road by Sonat and its predecessors "set the standard for reasonableness" and that Kelley's conduct, by contrast, was "much more invasive, damaged the premises, and diminished the desirability of the tract for the Connells' future retirement homes." 30,278 at p. 6, 706 So.2d at 1105. Thus the court concluded that while the Connell lease permits a lessee to use the surface of the leased tract for road construction, such use cannot increase the burden on the property unless the conduct is in good faith and for the mutual benefit of the parties. Id. Said the court, "The only `benefit' shown is a high-quality oilfield road where a `pig trail' used to lie; however, this road is unwanted, heavily traveled, and clearly not consistent *1261 with the mineral development of the Connell tract." 30,278 at pp. 6-7, 706 So.2d at 1105-06.
We granted defendants' application for certiorari to consider the correctness of the decision of the court of appeal. 98-1193 (La.6/26/98), 719 So.2d 485.

Applicability of Article 122
Disagreeing with the court of appeal that a mineral lessee's use of the surface of the leased premises for operations on adjacent lands always requires a mutual benefit for the lessor, we hold that the "mutual benefit" principle codified in Article 122 has no application to the "adjacent lands" clause, which represents a contractual bargained-for exchange between the parties.
An oil, gas and mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. La.Rev.Stat. 31:114. We thus look to the Mineral Code, along with the contract of lease between the parties, to define the parties' respective rights and obligations.
A mineral lessor is bound to deliver the leased premises, to refrain from disturbing the lessee's possession, and to perform the contract in good faith. See La.Rev.Stat. 31:119. On the other hand, the courts early recognized that a mineral lessee is "obliged to operate the leased premises in the best interests of both lessor and lessee." John M. McCollam, A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code, 50 Tul. L.Rev. 729, 804 (1976). This "mutual benefit" principle is now embodied in Article 122 of the Mineral Code.
Article 122 sets forth some of the obligations imposed on mineral lessees under pre-Code jurisprudence. In Frey v. Amoco Production Co., 603 So.2d 166, 174 (La. 1992), we considered the source of the obligations imposed by Article 122, stating:
In Louisiana, the implied covenants originate not in the general principle of cooperation found in the law of contracts... but rather as particularized expressions of Civil Code Article 2710's mandate that the lessee enjoy the thing leased as a "good administrator." ... The duty to act as a "reasonably prudent operator," imposed on the mineral lessee by Article 122 of the Mineral Code, is thus an adaptation of the obligation of other lessees to act as "good administrators."
By its express terms, Article 122 imposes on the mineral lessee the obligations (1) to perform the contract in good faith and (2) to develop and operate the leased property as a reasonably prudent operator for the mutual benefit of both lessor and lessee. The mutual benefit requirement pertains to the manner in which the lessee must develop and operate the leased premises.
The pre-Mineral Code jurisprudence in Louisiana recognized the lessee's duty as encompassing five distinct categories of obligations: (1) the obligation to develop reservoirs discovered; (2) the obligation to explore and test all portions of the leased premises after discovery of minerals in paying quantities; (3) the obligation to protect the leased property against drainage from wells on adjacent lands; (4) the obligation to diligently market the minerals discovered and capable of production in paying quantities; and (5) the obligation to restore the surface as near as practical on completion of operations. La.Rev.Stat. 31:122, Comment. The lessee's conduct in fulfilling these implied obligations is governed by the standard of the conduct expected of persons of ordinary prudence under similar circumstances and conditions, with due regard for the parties' respective interests. Frey, 603 So.2d at 175.
Scholarly treatises have recognized the implied obligations of a mineral lessee in other jurisdictions to include obligations to drill an initial exploratory well; to protect the leasehold from drainage; to reasonably develop the premises; to explore further and market the product; and to conduct with reasonable care and due diligence all operations on the leasehold that affect the lessor's royalty interest (including drilling, *1262 producing and marketing operations). See, e.g., 5 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law § 804 (1998). Other scholarly writings suggest that the implied obligations extend to the duty to represent the lessor fairly in regulatory proceedings. McCollam, supra at 810; Luther L. McDougal, Louisiana Oil and Gas Law § 4.7 at 234 (1991). However, we find no authority to extend the scope of the mutual benefit requirement of Article 122 to encompass the lessee's contractual right to reasonable use of the surface of the leased premises for operations on adjacent lands, and we conclude that the Legislature never intended for Article 122 to have such a broad sweep.
Our holding does not conflict with Frey, supra. There, we relied on Article 122, inter alia, to conclude that the lessor was entitled to royalties on take-or-pay payments made to the lessee by the gas purchaser. We observed that an economic benefit accruing from the leased land which is generated solely by virtue of the lease, and not expressly negated, is to be shared between the lessor and lessee in the fractional division contemplated by the lease royalty clause. Frey, supra at 174. In stark contrast to Frey, the matter before us does not involve an economic benefit flowing from the leased land or implicate the royalty clause in any manner.
Nor does our holding conflict with or negate the lessee's obligation under Article 122 to reasonably develop the leased premises. "The law of this state is well settled that the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract." Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 1034, 36 So.2d 26, 28 (1948). The jurisprudence interpreting the implied obligation of reasonable development holds that once production in paying quantities has been obtained from a mineral formation, the lessee is bound to develop the producing formation in the manner of a reasonable prudent operator, taking into consideration both his own interests and the lessor's interests. La.Rev.Stat. 31:122, Comment.
Here, it is undisputed that the co-lessees of the Connell tract fulfilled their contractual obligation to develop and operate the leased property in the manner of a reasonable mineral lessee. Moreover, there was no evidence of a violation of any other recognized obligation of a mineral lessee under Article 122.
Because we have concluded that the "mutual benefit" obligation of Article 122 does not preclude the mineral lessee's exercise of any contractual rights to reasonable use of the surface of the leased premises for operations on adjacent lands without any benefit accruing to the lessor because of that use, Article 122 does not apply in this case. We therefore proceed to examine the purpose of the "adjacent lands" clause and to review the factual determination of whether the co-lessee used the surface of the leased premises with reasonable regard to the rights of the lessors.

The "Adjacent Lands" Clause In General
In the absence of a violation of law or public policy, the mineral lease constitutes the law between the parties and regulates their respective rights and obligations. Frey v. Amoco Production Co., 603 So.2d 166, 172 (La.1992). See also La.Rev.Stat. 31:3. Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases. Frey, 603 So.2d at 171. Therefore, when the words of a mineral lease are clear and explicit and do not lead to absurd consequences, a court may not make further interpretation in search of the parties' intent. See La. Civ.Code art. 2046.
Although the granting of a mineral lease does not convey any title to the surface of the land, it is common for a mineral lease to expressly grant the lessee the right to undertake certain activities on the surface. *1263 Luther L. McDougal, Louisiana Oil and Gas Law § 3.4 at 119 (1991). "Even in the absence of a clause setting forth the types of surface activities the lessee may engage in on the leased premises, the lessee has an implied right to use the surface to the extent `reasonably necessary' to explore for and drill oil and gas wells." Id. at 119a (footnote omitted). See also La.Rev.Stat. 31:119 (mineral lessor is bound to refrain from disturbing the lessee's possession); Broussard v. Northcott Exploration Co., Inc., 481 So.2d 125 (La.1986) (mineral lessee must reasonably exercise its rights under mineral lease); Rohner v. Austral Oil Exploration Co., 104 So.2d 253 (La. App. 1st Cir.1958) (recognizing mineral lessee's implied right to use an area of the surface which is reasonably necessary to undertake certain works, including building roads for ingress and egress); Leger v. Petroleum Engineers, Inc., 499 So.2d 953 (La.App. 3d Cir.1986) (mineral lease impliedly authorized lessee to undertake subsurface injection of waste salt water attributable to production from other wells on leased premises).
An "adjacent lands" clause in a mineral lease goes a step further by providing expressly that the lessee may use the surface of the leased premises to conduct operations on adjacent land which is not owned by the lessee. Numerous commentators have recognized the validity of a contractual clause granting easements or surface rights in the leased property in connection with operations on other premises. See, e.g., Douglas Gross, "What Constitutes Reasonably Necessary Use of the Surface of the Leasehold By A Mineral Owner, Lessee, or Driller Under an Oil and Gas Lease or Drilling Contract," 53 A.L.R.3d 16 §§ 8(a) & 8(b) (1974); 1 Eugene Kuntz, Law of Oil and Gas § 3.2 (1987 & Supp.1999); 1 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law § 218.4 (1998); Hamilton E. McRae, "Granting Clauses in Oil and Gas Leases: Including Mother Hubbard Clauses," 2 Inst. On Oil & Gas L. & Tax'n 43 (1951).
An "adjacent lands" clause, although constituting a significant burden on the leased premises, promotes the efficient development of oil and gas fields and the state's public policy of developing mineral resources. The clause was intended to permit a lessee to develop an oil and gas field without regard to property lines and without the necessity of constructing duplicative roads, pipelines, tank farms and other facilities. However, the clause is limited to the term of the lease which continues in effect, after the delay rental period, only as long as there is production in paying quantities on the leased premises. Thus a mineral lessee cannot use the "adjacent lands" clause for access to operations on other premises unless the basic lease is being maintained by payment of delay rentals or by production.[4]
As one early commentator observed, "[T]he use of the leased premises in connection with other operations in the same area can in many instances accomplish more efficient and economical operation." McRae, supra at 57. Moreover, the "adjacent lands" clause, widely used in mineral leases for many years, resolves the impracticality for a mineral lessee to determine in advance which tracts of land will share in the production from a specific well, or whether a specific well will be productive, or whether the leased premises subject to the "adjacent lands" clause subsequently will be pooled or unitized with producing wells on the adjacent lands. When there are "adjacent lands" clauses in the leases of several tracts in a field, there is a potential benefit to all lessors, and the fact that one or more particular lessors ultimately do not receive any specific benefits *1264 from the lessee's use of the surface of the leased premises to conduct operations on adjacent lands does not affect the validity of the contractual provision.

The "Adjacent Lands" Clause In the Connell Lease
The granting clause of a mineral lease describes the purpose of the lease and specifies the uses of the land authorized for the lessee to accomplish the overall purpose. Leger v. Petroleum Engineers, Inc., 499 So.2d 953, 955 (La.App. 3d Cir.1986). In the present case, the granting clause authorized the lessee both (1) to conduct mineral operations on the leased premises for the production of oil and gas, and (2) to use the leased premises in connection with mineral operations conducted both on the leased premises and on adjacent lands.[5] These grants were supported by various considerations, including the mineral development of the lessors' property.
Plaintiffs first contend that the quoted language refers only to adjacent lands also owned by the same lessor. Plaintiffs would thus have us interpret the "adjacent lands" clause as a cover-all or "Mother Hubbard" clause, the purpose of which is "to protect the lessee in the event that the description fails to include adjacent lands owned by the lessor." McDougal, supra, at § 3.4 at 117.
The Connell lease in fact contains a "Mother Hubbard" clause,[6] which is distinct from the "adjacent lands" clause contained in the quoted paragraph. The "Mother Hubbard" clause in the Connell lease provides in pertinent part that the "lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land particularly described above." (emphasis added). In contrast, the "adjacent lands" clause refers to operations conducted on the leased land or "on any adjacent lands," regardless of whether the adjacent land is owned by the lessor.
Plaintiffs further argue that even if the "adjacent lands" clause is construed to permit a mineral lessee to use the surface of the leased premises to obtain access for the lessee's operations on adjoining lands not owned by the lessors, the clause should only apply to a lessee who is also the lease operator. Plaintiffs contend that allowing a non-operator co-lessee (such as Kelley) to use the surface was not intended by the parties to the lease contract and is not a reasonable interpretation of the provision.
Under plaintiffs' interpretation, the "adjacent lands" clause apparently would only apply when a lessee is the operator of record on both tracts. Such a constrained interpretation would render the "adjacent lands" clause virtually without effect. See La. Civ.Code art. 2049. Moreover, under the Connell lease, the operations by Sonat, as operator, or Kelley, as co-lessee, are indistinguishable from one another as to their lessors. See La.Rev.Stat. 31:130 (a partial assignment or partial sublease does not divide a mineral lease); La.Rev.Stat. 31:168 (mineral rights are susceptible of ownership in indivision); La.Rev.Stat. 31:174 (a use or possession of a mineral right inures to the benefit of all co-owners of the right); La.Rev.Stat. 31:177 (prohibiting operation without consent of all coowners to a mineral lease except in limited circumstances). See also La.Rev.Stat. 31:131, Comment (rule that mineral lessor must accept performance by assignee or sublessee "stems from the belief that the lessor's basic concern is that the obligations of the lease be properly performed" and that "as long as performance *1265 is being rendered, [lessor] has no major interest in who is rendering it.") Thus all co-lessees must consent to mineral operations on the leased property, and while one co-lessor frequently is deemed to be the operator, all co-lessees generally share in the benefits and the costs of the operation.
Accordingly, we conclude that the fact that Kelley is a co-lessee is more appropriate for consideration as a factor in weighing whether Kelley's use of the surface of the leased premises for conducting operations on adjacent lands is reasonable within the contemplation of the requirement in Article 11 that the lessee exercise its rights with "reasonable regard" for the rights of the lessor.

Reasonable Use of the Leased Premises
Having determined that the surface rights granted under the Connell lease clearly include uses necessary for operations on adjacent lands, we must now determine if Kelley's use of the surface of the leased premises was reasonable. See Hamilton E. McRae, "Granting Clauses in Oil and Gas Leases: Including Mother Hubbard Clauses," 2 Inst. On Oil & Gas L. & Tax'n 43, 58 (1951) (because courts have limited lessee's incidental rights, including surface use, to those necessary to the exercise of the purpose of the lease, "the right of surface use by the lessee gives rise to the corollary that lessee's use must not be negligent or unreasonable.") (footnote omitted).
The mineral lessee has the right to use the surface of the leased premises to the extent reasonably necessary for its operations thereon and on adjacent lands. This right is not unfettered, however. See, e.g., East v. Pan American Petroleum Corp., 168 So.2d 426 (La.App. 3d Cir.1964) (lessee acted unreasonably in excavating 14,000 cubic yards of dirt from leased premises to use in building board road to well on adjacent tract).
The Connell lease and the Mineral Code imposed upon the mineral lessee the standard of reasonableness with regard to the exercise of surface rights under the lease. Paragraph 18 of the Connell lease provided that "Lessee shall compensate Lessor for all damages to the timber, growing crops, fences and improvements on the premises occasioned as a result of the Lessee's operations hereunder." Additionally, paragraph 19 provided in pertinent part that the lessee, at the expiration of the lease, "shall ... restore the surface of the premises to as nearly as reasonably possible the condition in which it was at the commencement of the lease."
Significantly, La.Rev.Stat. 31:11 requires that the landowner and the mineral owner each exercise its respective rights "with reasonable regard for those of the other." The standard of reasonableness is "flexible" and "require[s] judicial interpretation to determine its impact on a given set of circumstances." McCollam, A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code, 50 Tul.L.Rev. 729, 811 (1976). See also La.Rev.Stat. 31:11, Comment. Although the standard of reasonableness in Article 11 "constitutes legislative form without specific content ... the thrust of the rule is to permit concurrent use of the land by the surface owner and the mineral owner with neither owner deemed to have a paramount right of use." McCollam, supra at 760. Finally, the reasonableness standard in Article 11 is not necessarily measured against a negligence standard. La.Rev. Stat. 31:11, Comment.
Accordingly, the circumstances which constitute an unreasonable exercise of contractual rights must be determined on a case-by-case basis. See Broussard v. Northcott Exploration Co., Inc., 481 So.2d 125, 129 (La.1986). The issue thus presents a question of fact which is subject to the manifest error standard of review. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
In the present case, the trial judge, who personally visited the site, concluded in denying plaintiffs' petition for preliminary injunction that "Kelley's use of the road was not contrary to the reasonableness standard and was consistent with rights *1266 granted under the Connell lease." The court of appeal erred in reversing the trial court without a finding of manifest error.
Of great importance is the fact that the road had been in existence since 1981 or earlier, and Sonat, Kelley and their predecessors used the road to drill and operate wells on the Connell tract and the Seamster tract. These operations involved daily use of the road by a pumper to each well and occasional use by an eighteen-wheel truck to haul salt water and condensate from the wells.
The evidence established that the road was inadequate for Kelley's purposes in connection with the drilling and completion of the Crichton well. According to a petroleum engineer for Kelley's contract operator, access twenty-four hours per day under all weather conditions is critical for ongoing mineral operations, as well as for safety, especially during the drilling stage of limited duration. He explained that although the existing road was "not ... in terrible shape," it was old and narrow and "needed some improvement"; the trucks, in attempting to navigate the road, became stuck and sometimes overturned, causing the filling in of ditches alongside the road; inadequate drainage allowed water to stand on the road, causing dirt to come onto the road; and timber growth also caused "somewhat blind curves." The engineer testified that he recommended adding a layer on top of the existing road and cutting smaller brush and timber alongside the road in order to improve the drainage. He explained that the additional layer improved the road from the north gate to the new well and would last for several years with low maintenance.
A Sonat employee also testified that the road was not an all-weather road and needed improvement. He had driven over the unimproved road for two years to service Sonat's two wells, and he described the unimproved road as "pretty sticky," explaining that he experienced difficulty in using the road in rainy weather because it was "real slick." Although he never found it impossible to service the wells because of the condition of the road, he occasionally observed that saltwater trucks could not make it up the road on rainy days. He further testified that the improvement of the road enhanced Sonat's operations on the Connell tract because "it's not near as much trouble getting [operations] out" and "not near as much wear and tear on [the] truck."
Although the traffic on the road increased during the two-to-three months of drilling and completion phases of Kelley's operation on the adjacent land,[7] this factor does not by itself establish that use of the road by Kelley and its contract operator was unreasonable. While traffic increased temporarily during the relatively brief drilling and completion operations, the traffic thereafter returned to the normal pattern of use that had been employed on the same location of the road for many years by Sonat and Kelley and their predecessors.[8]
Other evidence supported the trial court's finding of reasonableness. Sonat is also using the road for access to the Connell wells, and a Sonat employee testified that the road "has improved [Sonat's operations on the Connell tract] quite a bit." Moreover, while Kelley's contractor removed *1267 the north locked gate during the drilling and completion of the Crichton well, the contractor after completion restored the gate to its original position, and Kelley posted a security guard at the location while the gate was not in place.
In summary, Kelley's actions in improving the road, expressly authorized by the "adjacent lands" clause of the Connell lease, were reasonable. The unimproved road could not be used safely by the equipment needed to drill and complete the Crichton well. Moreover, the temporarily increased traffic, while heavy, was customary for such oil and gas operations.
The trial court properly found that Kelley and its contract operator used the road under the express authority of the lease to conduct mineral operations on adjacent lands and that their use was reasonable under the circumstances. There was no evidence that defendants ever used the road for any purpose inconsistent with the rights granted under the lease.[9]
We emphasize that the decision on the "reasonable regard" requirement of Article 11 might be different if a party bought a one percent interest in a mineral lease that had been held by production for twenty years and immediately proceeded to construct a new road, along with housing for its employees, on the leased premises in order to conduct operations on adjacent lands. However, on the facts and circumstances in the record in the present case, we cannot say that the trial court erred in finding that Kelley used the surface of the leased premises with reasonable regard for the rights of the lessors.

Decree
For these reasons, the judgment of the court of appeal is reversed, and the judgment of the trial court is reinstated.
NOTES
[*] Victory, J., not on panel. Rule IV, Part 2, § 3.
[1] The petition incorrectly refers to "Kelly Oil Company."
[2] La.Rev.Stat. 31:11 provides:

The owner of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other. Similarly the owners of separate mineral rights in the same land must exercise their respective rights with reasonable regard for the rights of other owners.
[3] La.Rev.Stat. 31:122 provides:

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
[4] A simple hypothetical illustrates this point. Lessee secures two separate mineral leases, with "adjacent lands" clauses, covering adjoining properties owned by two unrelated entities. Lessee uses the surface of tract A to obtain access to tract B, ultimately obtaining production on tract B. If tract A is not included in a unit, once the delay rental period has passed (or in the absence of a delay rental clause), the lessee must obtain production on tract A or the lease on tract A will terminate by its own terms.
[5] The emphasized language in the paragraph quoted earlier in the opinion expressly authorizes the lessee to construct and use roads across the Connell tract necessary for operations on adjacent lands.
[6] The "Mother Hubbard" clause in the Connell lease provides:

This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land particularly described above. For the purpose of calculating the rental payments hereunder provided for, said land is estimated to comprise 140 acres, whether it actually comprises more or less. (emphasis added).
[7] During the first phase of the project, eighteen-wheelers with 80,000 pounds capacity made about fifty trips to haul the drilling rig and associated equipment down the improved road to the Crichton well over about a two-day period. At drilling completion, the same number and type of rigs hauled the equipment out over the improved road in a similar time period, and additional rigs used the improved road in connection with a three-stage fracture job during the completion phase.
[8] Since the completion of the Crichton well, one pumper makes one trip each day to both the Crichton well and the Seamster well using a three-quarter ton pickup truck. An eighteen-wheeler hauls saltwater from the Crichton well once a week and from the Seamster well once every two weeks. An eighteenwheeler collects condensate from the Crichton well twice a month and from the Seamster well once a month. Additionally, a threeton truck must visit the site twice a month while the well is new.
[9] Moreover, defendants have fully compensated plaintiffs for any damages to the land and timber.