738 So.2d 1196 (1999)
WILL-DRILL RESOURCES, INC., Plaintiff-Appellee,
v.
HUGGS INCORPORATED, et al., Defendants-Appellants.
No. 32,179-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1999.
Rehearing Denied September 16, 1999.
Cook, Yancey, King & Galloway by J. William Fleming, F. Drake Lee, Jr., Shreveport, Counsel for Appellants.
Davidson, Nix & Jones by John S. Hodge, Shreveport, Counsel for Concursus Plaintiff/Appellee, Will-Drill Resources, Inc.
Blanchard, Walker, O'Quin & Roberts by William Timothy Allen, III, J. David Garrett, Shreveport, Counsel for Concursus Defendants/Appellees, Shirley Ann Gladney, et al.
Before NORRIS, PEATROSS & DREW, JJ.
PEATROSS, J.
This appeal arises from a proceeding in concursus to determine to whom certain royalties should be paid for oil production from a well located within a unit established by the Louisiana Office of Conservation. Specifically, the dispute is over the activation of a Pugh Clause[1] contained in *1197 an oil, gas and mineral lease. The trial court granted summary judgment in favor of Will-Drill Resources, Inc. and the royalty owners of Gladney Well No. 1 (collectively referred to herein as "WDR"), and against Huggs Incorporated, et al ("Huggs"), finding that the Pugh Clause was triggered by the unitization of land within the leased premises, thereby causing the expiration of the lease as to the remaining leased acreage not included in such unit. As a result, the trial court directed disbursement to WDR of the stake held in the registry of the court. Huggs suspensively appeals the judgment of the trial court. For the reasons stated herein, the judgment of the trial court is reversed.

FACTS
The only issue on appeal is one of law regarding the activation of the Pugh Clause in the oil, gas and mineral lease. The following facts were undisputed:
1. Rock Creek I, Ltd. and LHS, Smith & Smith, Ltd., L.L.P., are the owners in undivided proportions of 100% of the working interest in that certain oil, gas and mineral lease dated January 10, 1975, from James K. Gladney, et al, as lessors, to Huggs Incorporated, as lessee, recorded in Claiborne Parish ("Huggs-Gladney Lease").
2. Huggs is the owner of an overriding royalty and reversionary working interest in the Huggs-Gladney Lease; Sirius Corporation is the owner of an overriding royalty interest carved out of the working interest in the Huggs-Gladney Lease.
3. Under its express written terms the Huggs-Gladney Lease covers the entirety of the Northwest Quarter of Section 27 and the entirety of the Northeast Quarter of Section 27, T 20 N, R 7 W, Claiborne Parish.
4. The Huggs-Gladney Lease contains a Pugh Clause written as follows:
19. Any provision in this lease to the contrary notwithstanding, it is expressly agreed that if, either by an order of the Commissioner of Conservation of Louisiana, or by any other State or Federal authority having control of such matters, or in the manner hereinabove provided, a drilling and/or production unit be created and established, pooling and combining a portion of the lands covered by this lease with other lands, lease or leases in the vicinity thereof, then drilling operations on or production of oil, gas, sulphur or other minerals from such unit shall continue this lease in force and effect during or after the primary term only as to the lands covered hereby which are included in such unit, irrespective of whether such drilling operations be conducted on, or production be secured from lands covered hereby, or from other lands embraced within such unit, it being expressly agreed that drilling operations on, or production from any drilling or production unit, however created or established, shall not maintain this lease in force or effect during or after the primary term as to any of the land covered hereby which are not included in such unit. This lease, during any period in which it is being so maintained as to a part of the land covered hereby may be maintained as to the remainder of said lands in any manner elsewhere provided for herein; provided that if it be maintained by rental payment, the rentals may be reduced in proportion to the number of acres in such unit or units as to which this lease is being maintained by drilling operation or production.
5. Office of Conservation Order No. 48-A, et seq., established drilling and production units for the Pettit (Restricted) Lime in the Athens Field, Claiborne Parish. The Pettit Lime is a subsurface geological zone or formation for which drilling and production units have been established comprising, respectively, *1198 the Northwest Quarter of Section 27, designated as PET RA SUT, and the Northeast Quarter of Section 27, designated as PET RA SUB.
6. Gladney Well No. 2 is located in the Northeast Quarter of Section 27 and is producing from the Pettit (Restricted) Lime as defined in Office of Conservation Order No. 48-A and serves as the unit well for PET RA SUB.
7. In 1996 WDR acquired a series of oil, gas and mineral leases affecting the entirety of the Northwest Quarter of Section 27. There are several owners under these leases who are collectively referred to as the "royalty owners."[2]
8. WDR drilled Gladney Well No. 1 in the Northwest Quarter of Section 27 which is producing from the Pettit (Restricted) Lime as defined in Office of Conservation Order 48-A and is designated as the unit well for PET RA SUT.
9. There is a dispute as to whether the Huggs-Gladney Lease or the WDR Leases are effective as to Gladney Well No. 1 in the Northwest Quarter.
10. The Huggs-Gladney Lease provides for a 1/8th royalty; the WDR Leases provide for higher royalties.
11. The Huggs-Gladney Lease Owners and WDR have compromised and settled their dispute with respect to ownership of the working interest in Gladney Well No. 1.
12. If the Huggs-Gladney Lease is a valid oil, gas and mineral lease as to the Northwest Quarter of Section 27, the disputed royalty is due the working interest owners in Gladney Well No. 1; on the other hand, if the WDR Leases are valid as to the Northwest Quarter of Section 27, the disputed royalty is due the royalty owners.
WDR filed a Concursus Petition to determine ownership of the disputed royalty. The named defendants included Huggs Incorporated, Rock Creek Ranch I, Ltd., LHS, Smith & Smith, Ltd., and Sirius Corporation. All parties filed motions for summary judgment. WDR and the royalty owners argued that the Pugh Clause was operative and that the Huggs-Gladney Lease had expired by virtue of the operation of the clause and the trial court agreed. As previously stated, the trial court granted WDR's and the royalty owners' motions for summary judgment, denied Huggs' motion for summary judgment and directed disbursement of the stake held in the court's registry (the disputed royalty) accordingly.

DISCUSSION
A trial court's granting of summary judgment is reviewed de novo under the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Reynolds v. Select Properties, Ltd. 93-1480 (La.4/11/94), 634 So.2d 1180; Schroeder v. Board of Supervisors of LSU, 591 So.2d 342 (La.1991). Generally, contract interpretation is a question of law and is reviewed de novo. Sandefer Oil & Gas, Inc. v. Duhon, 961 F.2d 1207 (5th Cir.1992). Although the parties disagree as to its operation, neither party claims that the Pugh Clause is ambiguous as written; therefore, we proceed to construe it de novo.
This is a case of first impression in our circuit; and, in light of the specific language of the Pugh Clause, the Louisiana Civil Code articles and jurisprudence governing the interpretation of oil, gas and mineral leases, and the purposes of this type of clause, we must disagree with the trial court's legal conclusion that the Pugh Clause was activated in this case. For the reasons set forth herein, we find that the drilling of Gladney Well No. 2, in the Northeast Quarter of Section 27, maintained the Huggs-Gladney Lease as to the *1199 entire leased premises, despite the unitization of the Northwest Quarter.
The general rule prevailing with respect to the maintenance of oil, gas and mineral leases is that the drilling of a well on the premises covered by the lease during the primary term of the lease, assuming such well produces in paying quantities, maintains the lease as to all of the lands covered by the lease. La. R.S. 31:114. The comments to article 114 state that parties may provide for a result other than that which is contemplated by the article, which is frequently accomplished by the inclusion of a Pugh Clause in the lease. The inclusion of a Pugh Clause effectively reverses earlier jurisprudence[3] regarding the maintenance of an entire leased premises, with the result that if there is unitization and production is obtained from the unit, the lease is maintained only as to that portion of the leased premises within that unit. The inclusion of a Pugh Clause is a matter of contract, i.e., agreement between the parties, and not all such clauses are identical. We begin, therefore, with an analysis of the specific language of the Pugh Clause contained in the Huggs-Gladney Lease.
Huggs characterizes the Pugh Clause as an "if/then" clause; if X happens then Y is the result. Quoting from the Pugh Clause in this case: "if ... a drilling and/or production unit be created and established, pooling and combining a portion of the lands covered by this lease with other lands, lease or leases in the vicinity thereof, then" the remainder of the clause is triggered and the lease may be severed. It is Huggs' argument that the "if" portion of the clause was not met because the unitization by the Office of Conservation Order did not pool or combine Huggs-Gladney leased land with "other land, lease or leases." Instead, Huggs points out that 100 percent of the unit was Huggs-Gladney leased land. Huggs asserts that, because this condition was not met, the Pugh Clause exception to the general rule stated above was not activated; and, therefore, under the general rule, the drilling of Gladney Well No. 2 in the Northeast Quarter was sufficient to maintain the lease as to all the property covered by the lease.
WDR counters Huggs' argument asserting that the second section of the Pugh Clause has independent meaning. WDR argues that Huggs' analysis stops prematurely and does not address the following language: it is "expressly agreed that drilling operations on, or production from any drilling or production unit, however created or established, shall not maintain this lease in force or effect during or after the primary term as to any of the lands covered hereby which are not included in such unit." WDR claims that this language does not clarify previous language, but sets forth an independent application of the Pugh Clause. According to WDR, this second section uses the term "any" land without requiring the "pooling" or "combining" of "other lands" as is required in the first section of the Pugh Clause. It is WDR's position, therefore, that because Huggs did not develop the Northwest Quarter of Section 27 within the primary term of the Huggs-Gladney Lease, the Pugh Clause was activated and the lease expired. After careful review of both positions, we find Huggs' argument to be the more convincing.
A complete reading of the Pugh Clause simply does not support the conclusion that the phrase which starts "it being expressly agreed ...," the phrase upon which WDR relies, is anything more than a restatement of the more particularized wording of the first few phrases of the clause. A finding to the contrary would, as Huggs asserts, effectively render the more particularized language "if, either by an order of the Commissioner of Conservation of Louisiana, or by any other State or Federal authority having control of such matters, or in the manner hereinabove provided, a drilling and/or production unit *1200 be created and established, pooling and combining a portion of the lands covered by this lease with other lands, lease or leases in the vicinity thereof" unnecessary surplusage. It is well-established in our jurisprudence that a contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. See Lambert v. Maryland Casualty Co., 418 So.2d 553 (La.1982). Simply put, if we accord the latter phrase independent meaning, treating it as a summary phrase as suggested by WDR, it would have been completely unnecessary to spell out the circumstances under which the lease would be severed by unitization, which is set forth in the initial phrases of the clause.
Additionally, the purpose of the Pugh Clause and the concepts of pooling and unitization support our finding that because the unit formed in this case consisted entirely of leased land, the Pugh Clause was not activated. The main purpose of a Pugh Clause is to protect the landowner-lessor from the anomaly of having the entire property held under lease by production from a very small portion. It was designed to "prevent undesirable legal consequences of unitizing for the landowner-lessor." Fremaux v. Buie, 212 So.2d 148 (La.App. 3d Cir.1968). In order to understand this purpose and determine what events trigger the operation of a Pugh Clause, we find it necessary to understand the nature of pooling and unitization. This is so because, by its own terms, the Pugh Clause in this case specifically defines the "triggering event" as unitization. The clause also speaks to the situation wherein a portion of the leased land is pooled or combined "with other land, lease or leases in the vicinity thereof."
Williams & Meyers, Oil and Gas Law, 1143 (Patrick H. Martin and Bruce M. Kramer, eds.), defines unitization as follows:
A term frequently used interchangeably with Pooling but more properly used to denominate the joint operation of all or some portion of a producing reservoir as distinguished from pooling, which term is used to describe the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules.
Pooling is important in the prevention of drilling of unnecessary and uneconomic wells, which will result in physical and economic waste. Unitization is important where there is separate ownership of portions of the rights in a common producing pool in order that it may be made economically feasible to engage in cycling, pressure maintenance or secondary recovery operations and to explore for minerals at considerable depth.
Pooling and unitization of two or more tracts of land into one unit for drilling and production purposes has become the common practice in mineral production operations for conservation and efficiency. See Fremaux v. Buie, supra, n. 1. For Pugh Clause purposes, the concepts of pooling and unitization, therefore, connote a "merging or integrating of separate rights to produce." Patrick H. Martin, Mineral Rights, 53 La. L.Rev. 891 (1993). Against this background, it is readily apparent that the Pugh Clause operates in this context to prevent a landowner-lessor's royalty interest from being diluted by inclusion of only a portion of his leased land in a unit with land held by other interests. As Huggs suggests, in that instance, without a Pugh Clause, the entire lease could be maintained by payment of the landowner of the potentially small portion of the royalty attributable to his interest in the unit. If, however, the unit is comprised entirely of the leased premises, as it is in this case, the consequences to the landowner-lessor are the same as if the well were a lease well. The undesirable effects of unitization upon the landowner-lessor, which the Pugh Clause is designed to protect against, do not arise when the unit is made up only of leased land.
*1201 Finally, WDR and the trial court relied on the case of Banner v. GEO Consultants International, Inc., 593 So.2d 934 (La.App. 4th Cir.1992). In Banner, the plaintiffs granted to Geo mineral leases covering 1,220 acres of land. Geo assigned the leases to Devon. In 1990, Devon reassigned the leases to Geo, except for 160 acres which surrounded a producing well. Plaintiffs sued to dissolve the lease for failure to develop the land outside the 160-acre tract within the primary term of the lease. The court held that the 160-acre tract was a unit and invoked the Pugh Clause. While similar at first glance, a comparison of the Pugh Clause in Banner and the Pugh Clause in the case sub judice reveals a significant distinction. The instant clause specifically uses the terms "pooling and combining" of leased land with other land, lease or leases. Such terms define the parameters of the clause, i.e., the "if" portion of the condition. The Pugh Clause in Banner did not include these specific terms. For this reason, we find Banner not to be controlling in the instant case; however, to the extent Banner is inconsistent with our decision, we decline to follow it.[4]
In summary, we find that the language chosen by the parties to express their intent regarding operation of the Pugh Clause, clearly indicates that the circumstance under which the Pugh Clause would sever the lease is whenever leased land is pooled or combined with other lands, lease or leases which did not occur in the unitization at issue in this case.

DECREE
For the reasons stated herein, the judgment of the trial court granting summary judgment in favor of Will-Drill Resources, Inc. and the royalty owners is reversed. Costs of this appeal are assessed equally to Will-Drill Resources, Inc. and the royalty owners.
REVERSED.
APPLICATION FOR REHEARING
Before NORRIS, C.J., WILLIAMS, GASKINS, PEATROSS, and DREW, JJ.
Rehearing denied.
NOTES
[1] The clause is named after its creator, Lawrence G. Pugh, Sr., a distinguished attorney from Crowley, Louisiana.
[2] The royalty owners include Shirley Ann Gladney Prince, Timothy King Gladney, Dovie Gladney Hensely, Kimbell Tatum Hays, Patricia Hays Bryan, Emma Hays Atkins, Frances Hays Bays, L.H. Featherston, III, Lewis Odom, Judd & Company, Timothy H. Marshall and Dirck E. Wuellner.
[3] See Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947) and LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855 (1950).
[4] Patrick H. Martin, a professor at LSU law school, also challenged the decision stating: "The Banner court apparently completely misunderstood the nature of a unit, failing as it did to understand that a unit merges or integrates separate rights to produce.... Under the approach adopted by the court, any sublease or assignment of a portion of a lease may be treated as a unit for Pugh Clause purposes. This is clearly erroneous." Patrick H. Martin, Mineral Rights, 53 La. L.Rev. 891 (1993).