MOORE, J.
|TThe lessors, Woodard Villa Inc. and its principal, Ernest Scott Woodard (collectively, “Woodard”), appeal a summary judgment declaring that the entirety of their mineral lease was maintained, at Haynesville Shale depth, by a well drilled by the working interest owner, Questar Exploration & Production (“QEP”), when the well was drilled off the lease premises and on land not unitized with the lease premises, but the well’s horizontal shaft entered the Haynesville Shale formation under the lease premises. For the reasons expressed, we affirm.

Factual and Procedural Background

On August 5, 2004, Woodard granted a mineral lease to Cowgill & Associates affecting a tract of 1,480.3 acres in Sections 22, 23, 26, 27 and 35, T 15 N, R 9 W, in Bienville Parish.[1] The lease had a primary term of three years, but in July 2007 *736 Woodard and Cowgill executed an extension of one year, meaning the primary term would end August 5, 2008. The body of the lease contains a lease agreement from which the adjacent lands clause has been scratched out (¶ l),[2] and the appendix of the lease includes a Pugh clause (¶ 11),[3] a depth limitation after primary term clause (also called a | ¡/‘horizontal Pugh clause,” ¶ 6)[4] and a declared units clause (¶ 19).[5] At some point, QEP acquired all of Cowgill’s rights as a working interest owner. Prior to August 5, 2008, QEP or its predecessors drilled and completed at least one well into the Cotton Valley formation on each of the five units encompassing the entirety of the lease premises. However, there were no wells into the Haynesville Shale formation.
In May 2009, QEP began drilling the Jimmy Woodard 34 H No. 1 well (“JW # 1”) on a surface location in Section 34, not part of the lease premises and not in a unit containing any of the lease premises. However, by virtue of horizontal drilling, this well turned north and reached into the Haynesville Shale unit lying under lease premises in Section 27. The parties agreed that JW # 1 entered this Haynes-ville Shale unit on July 16, 2009, about three weeks before the horizontal Pugh clause would take effect. JW # 1 was completed on November 23, 2009, after the horizontal Pugh clause took effect, and reached a maximum depth of 12,456 feet in the Section 27 Haynesville Shale unit.
Meanwhile, in August and September 2009, Woodard’s counsel [..¡notified QEP that in Woodard’s view, the lease had expired as of August 5, 2009, as to all depths below the Cotton Valley formation, notwithstanding JW #1; it offered to discuss leasing its Haynesville Shale rights to QEP. In October, Woodard demanded a partial release of the lease in exchange for *737 dropping any claims for damages. In December 2009, QEP responded by tendering to Woodard a partial release as to depths below the Haynesville Shale formation, 12,556 feet. Woodard declined to sign this, as it would have blocked Woodard from leasing its nearly 1,500 acres in the Haynesville Shale.
QEP filed this suit in February 2010 seeking a declaratory judgment that the lease was maintained to a depth of 12,556 feet, by virtue of JW # 1, over the whole lease premises.
Woodard answered that prior to August 5. 2008, the deepest well affecting the lease was in the Cotton Valley formation; at the end of the primary term, the lease was divided into five individual units, pursuant to the Pugh clause; during the additional year before the horizontal Pugh clause took effect, QEP drilled no wells that would maintain the lease below the Cotton Valley formation. Woodard also reconvened for damages, bonus money and higher royalties it would have received from leasing its Haynesville Shale rights.
The parties ultimately stipulated to all the facts outlined above. QEP filed the instant motion for summary judgment, seeking a declaration that the entire lease had been maintained to a depth of 12,556 feet (Haynesville Shale formation). Woodard filed a motion for partial summary judgment, ^seeking a declaration that JW # 1 did not serve to maintain the lease to any depth below Cotton Valley, or if it did, only to that portion of the lease lying in the Haynesville Shale Section 27 unit. The parties briefed their positions extensively but agreed that the legal issue was novel: can a well drilled off-lease, but reaching horizontally into a formation under the lease, maintain operations as to all, or at least part, of the lease?
At a hearing in October 2012, the parties argued their positions and submitted the stipulations previously entered. Ruling from the bench, the court initially stated that JW # 1 “was drilled apparently in Section 27, then that should be the only area that the depth limitation should apply[,]” but then concluded, “I don’t think I have a choice but to interpret it that the depth limitation applies to all of it, the leased premises if that’s what the lease says.” The court therefore granted QEP’s motion and denied Woodard’s.
Woodard has appealed, designating four assignments of error and advancing them as three issues.[6]

Discussion: Effect of Pugh Clause

By its second assignment of error, Woodard urges that the court erred in finding that the Pugh clause did not act to separate the maintenance requirements of the lease, so that each of the separate units created by the Office of Conservation that contains lease property is maintained separately. Woodard quotes the Pugh clause, specifically, “as to that portion of the leased premises embraced in such unit[,]” and argues that once this is | (¡triggered, a well producing from one unit “will only apply to satisfy the maintenance requirement of that unit.” In support, Woodard cites various Louisiana cases,[7] *738 federal cases,[8] out-of-state cases[9] and reference books,[10] as refuting QEP’s claim that “as long as a well is producing from one unit, that one well will serve to maintain all 1,480.3 acres of leased property located in any and all units, regardless of whether the activities within each separate unit may support its own maintenance.” Woodard argues that by QEP’s reasoning, a lessee need only get the entire lease premises unitized into different units, drill a well in one unit, and thereby maintain the whole lease; this would negate the purpose of the Pugh clause and create a loophole that any lessee may use to maintain acreage outside a given unit. Woodard provides several color diagrams to illustrate various situations, and argues that the declared units clause (¶ 19) forced QEP to unitize the entire lease. Woodard concludes that the Pugh clause was intended to require action by the lessee in order to maintain the lease.
QEP responds that a mineral lease is presumptively indivisible[11] and lfithat even though a Pugh clause may provide for the subdivision of a lease, as occurred in Rose-berry and Peironnet, the instant Pugh clause makes no such provision. In fact, the reference to maintenance of “this lease as to that portion of the leased premises embraced in such unit or units” shows an intent not to subdivide the lease. QEP also submits that all of the lease premises are located within producing units, and hence the entire lease has been maintained.
Louisiana’s Mineral Code provides that operations on any portion of the lease “or on land unitized therewith” will maintain the lease “as to the entirety of the land burdened” by the lease. La. R.S. 31:114. This broad principle can be altered contractually by the inclusion in the lease of a Pugh clause. The main purpose of the Pugh clause is to protect the lessor “from the anomaly of having the entire property held under lease by production from a very small portion.” Will-Drill Resources v. Huggs Inc., supra. However, not all Pugh clauses are identical. Id.
Woodard correctly shows that in Peiron-net, supra, the Pugh clause expressly stated that each unit “shall be treated as constituting a separate lease,” and that in Roseberry, supra, certain language was “clearly intended to negate the general rule” of R.S. 31:114. On close examination, however, we find no such similar intent in the instant Pugh clause. Woodard has not cited any provision of the lease, and our own reading of it has uncovered none, referring to separate leases or a division of the lease. The Pugh clause states that operations from any well situated on lands included within a unit |7or units embracing a portion of the lease premises will maintain the lease only “as to that portion of the leased premises em *739 braced in such unit or units,” but further states:
This lease may be maintained as to acreage not included in such unit or units in any other manner provided for herein, including continuous development as provided for in paragraph 6 of the body of the lease form.
The absence of any mention of separate leases or division of the lease, and the Pugh clause’s specific reference to this lease, show that the parties did not intend for the clause to separate or divide the lease. When the words of a mineral lease are clear and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046; Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99), 737 So.2d 1257. Moreover, the parties stipulated that QEP or its predecessors drilled wells within all five units constituting the entire lease between the date of the lease and the end of the primary term.[12] On this record, there is no absurd consequence of maintaining the entire 1,480 acres by the operation of a well on the Section 27 unit; operations on all five units clearly maintained the entire lease beyond the primary term. This assignment of error lacks merit.

Effect of JW #1

By its third assignment of error, Woodard urges the district court erred in finding that JW # 1 served to maintain the lease property as to those depths below the base of the Cotton Valley formation. Woodard shows that [ sthe parties scratched out the adjacent lands provision of ¶ 1, and quotes a portion of the horizontal Pugh clause, ¶ 6: “the deepest well shall be drilled on the leased premises or on a unit(s) embracing some part of the leased premises[.] ⅜ * * [A] productive formation is discovered and the same is producing when the depth limitation takes effect.” The combined effect of these two provisions is that in order to maintain the lease beyond the primary term, the well must be drilled on the lease or in a unit containing leased land. Courts strictly construe Pugh clauses.[13] Since JW # 1 was not drilled on the lease premises, and not drilled on, completed or producing from land within a unit embracing some part of the lease premises by August 5, 2009, Woodard concludes that the horizontal Pugh clause ceased to affect depths below the Cotton Valley formation.
QEP responds that the adjacent lands clause permits the lessee to use the lease premises to conduct operations on adjacent lands not owned by the lessor, Caskey v. Kelly Oil Co., supra, and the deletion of this clause has no bearing on the case since QEP was never trying to use the lease premises to develop lands off the lease. Further, the horizontal Pugh clause holds the entire lease through the base of the Haynesville Shale formation. The primary term ended August 5, 2008, at which time the whole lease premises was subject to the lease; in February 2009, Conservation established a Haynesville Shale unit encompassing the entirety of Section 27; QEP drilled JW # 1 as the unit well for this unit; JW # 1 was spudded on May 23, 2009, and entered the unit formation on the lease premises on July 16, well before 19the August 5, 2009, trigger date for the horizontal Pugh clause. Finally, the horizontal Pugh clause does not require actual production to maintain depths, and is in *740 this respect different from the standard Pugh clause.
Woodard correctly shows that the parties scratched out a portion of the lease agreement, with the effect of denying the lessee the right to enter and use the lease premises “for operations hereunder or in connection with similar operations on adjoining lands.” Had this portion been left in place, it would have granted QEP the right to use the lease premises to access and develop adjacent lands not owned by Woodard; without it, QEP has no such right.[14] Obviously there is no issue in this case of QEP seeking to use the lease premises to access and develop adjacent property not owned by Woodard, and from which Woodard would draw no benefits. The deletion of the adjacent lands clause is, as QEP suggests, irrelevant to the resolution of this issue.
Critically, the horizontal Pugh clause maintains the lease over the lease premises, from the surface to 100 feet below the deepest well, subject to two provisions: (1) “the deepest well * * * shall be drilled on the leased premises or on a unit(s) embracing some part of the leased premises” (2) “during the primary term, plus one (1) year.” Owing to the extension executed in July 2007, the primary term ended August 5, 2008; the additional year granted by the second provision ended August 5, 2009. The parties stipulated that in February 2009, Conservation designated a unit for Section 27, and this unit encompasses part of the lease premises; QEP | ,flspudded JW # 1 on a location in Section 34, not part of the lease premises and not on a unit including any of the lease premises, on May 23, 2009; with horizontal drilling, the well turned north and went under the Section 27 unit on July 16, 2009; JW # 1 was completed to a depth of 12,456 feet under Section 27 on November 23, 2009. These facts persuade us that QEP satisfied the horizontal Pugh clause, to 100 feet below JW # l’s deepest depth, by drilling and entering the Section 27 unit on July 16, 2009, 20 days before the time limit, even though the spud location was off-lease and off-unit. We perceive no error in the district court’s ruling.
Presented with a different issue, the supreme court recently reiterated that wells drilled on adjacent tracts that were force-pooled with the lease premises nevertheless served to maintain the lease. Peironnet v. Matador Resources, supra at 40-41, — So.3d at -. The court reasoned that lessors generally benefit from the development of a unit in which their property is located, even if the drilling occurred offsite. This rationale appears equally applicable in the instant situation; with the advent of horizontal drilling, operators may access leased property or units remotely. Conceivably, this could be a courtesy to the lessor, who does not want wells and noisy drilling operations on his property. When the lessee complies with the provisions of the horizontal Pugh clause, as occurred here, those operations should be held to satisfy the maintenance requirement. This assignment of error lacks merit.
| nAlternatively, Partial Maintenance
By its fourth assignment of error, Woodard urges the court erred in denying its alternative claim that, with the exception of the portion of the lease premises located within Section 27, QEP’s activities did not serve to maintain the lease as to all depths below the base of the Cotton Valley formation. Woodard argues that QEP had an opportunity to drill deeper wells into each unit for an entire year after the horizontal Pugh clause was triggered, but in *741 four other section units, it drilled only into Cotton Valley; however, three months after the clause was triggered, QEP drilled a horizontal well from another landowner’s property which is not pooled in any unit with the lease tract but is completely within the Section 27 Haynesville Shale unit. Woodard contends that the lease provisions and these actions served to segregate the lease.[15] Woodard concludes that if the activities with JW # 1 had any effect on this lease, it was only with respect to the Section 27 Haynesville Shale unit, not the other four units.
QEP reiterates that the mineral lease is presumptively indivisible; the use of the language “to maintain this lease in force beyond the primary term as to that portion of the leased premises embraced in such unit or units” serves only to segregate the lease for maintenance purposes, not to divide the lease.[16] In light of the admitted operations on units encompassing the entirety of the lease premises, QEP submits that the lease is in force over the whole lease premises and down through the Haynesville Shale formation.
|1p.We are unpersuaded by Woodard’s argument that this Pugh clause divided the lease. As noted above, the lease is fundamentally indivisible, La. R.S. 31:114, and a division of the lease will be recognized when the lease agreement clearly provides for it, as in Roseberry, supra. Without such special provision, the Pugh clause segregates the lease into separate portions for maintenance purposes only, with the objective of protecting the lessor from having the entire property held under lease by production from only a very small portion. Will-Drill Resources v. Huggs, supra at 6-7, 738 So.2d at 1200. The statement over 50 years ago in Broussard v. Phillips Petroleum Co., supra, that the “effect of the [Pugh] clause is to divide or segregate the lease” must be deemed superseded by the more comprehensive rulings of the Fifth Circuit in Rougon v. Chevron USA, supra, by this court in Will-Drill Resources v. Huggs, supra, and by the Western District itself in Alyce Gaines Johnson Special Trust v. El Paso E & P Co., 773 F.Supp.2d 640 (W.D.La.2011).
In this case, QEP or its predecessors performed operations on all five units encompassing the lease premises; there is no issue of a “recalcitrant” lessee ignoring large portions of the lease. Moreover, the horizontal Pugh clause does not operate on a unit-by-unit basis. On de novo review, we find no genuine issues of material fact, a correct interpretation of the mineral lease, and that QEP is entitled to summary judgment as a matter of law. This assignment of error lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. All costs are to be paid by Woodard Villa Inc. and Ernest Scott Woodard.
AFFIRMED.

. Each of the five sections was ultimately designated by the Department of Conservation as an individual unit for the Hosston (shallow) and Cotton Valley (medium) formations and, later, for the Haynesville Shale (deep) formation.

. ¶ 1 grants lessee the "exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration * * *, with the right of ingress and egress to and from said lands at all times for such purposes, including for-operations-hereunder or in connection with -similar-operations on adjoining lands[.]"

. ¶ 11: "Notwithstanding anything to the contrary contained herein, the commencement of operations for drilling * * * from any well situated on lands included within a unit or units embracing a portion of the leased premises and other lands not covered hereby shall only serve to maintain the lease in force beyond the primary [term] as to that portion of the leased premises embraced in such unit or units. This lease may be maintained as to acreage not included in such unit or units in any other manner provided for herein, including continuous development as provided for in paragraph 6 of the body of the lease form.”

. ¶ 6: "This lease shall cover and affect the land described herein from the surface of the earth down to one hundred feet (100’) below the stratigraphic equivalent of the deepest depth to which the deepest well shall be drilled on the leased premises or on a unit(s) embracing some part of the leased premises during the primary term, plus one (1) year. Provided, however, that if a productive formation is discovered and the same is producing when the depth limitation takes effect, this lease shall extend to the base of such formation so as to include all of such formation under the lease plus one hundred feet, though no well shall have been drilled to the depth of said base or lower limit of such formation."

.¶ 19: "Notwithstanding anything contained to the contrary herein, in the absence of production units formed by the State of Louisiana Office of Conservation, or other regulatory body. Lessee, its successors or assigns, must declare a production unit for any well producing on the leased premises. Such United Declaration must be made in writing, recorded in the public records, will unitize contiguous acreage, and may include not more than 640 acres, more or less, for a gas well, nor more than 80 acres, more or less, for an oil well.”

. The first assignment of error urges merely that the court erred in granting QEP's motion for summary judgment. The remaining assignments advance the substantive claims.

. Will-Drill Resources Inc. v. Huggs Inc., 32,179 (La.App. 2 Cir. 8/18/99), 738 So.2d 1196, writ denied, 99-2957 (La.12/17/99), 751 So.2d 885 (a case which actually found no activation of the Pugh clause because the whole lease premises was unitized); Roseberry v. Louisiana Land & Exploration Co., 470 So.2d 178 (La.App. 2 Cir.1985). In district court, Woodard also relied heavily on Peironnet v. Matador Resources Co., 47,190 (La.App. 2 Cir. 8/1/12), 103 So.3d 445, but the supreme court subsequently reversed that decision, 2012- *738 2292 (La.6/28/13), - So.3d -, 2013 WL 3752474.

. Rougon v. Chevron USA Inc., 575 F.Supp. 95 (M.D.La.1983); Morrison v. Conoco Inc., 575 F.Supp. 876 (M.D.La.1983).

. Morgan v. Mobil Oil Corp., 556 F.Supp. 108 (D.Kan.1983); Thoroughbred Assocs. LLC v. Kansas City Royalty Co., 45 Kan.App.2d 312, 248 P.3d 758 (2011), review granted (12/19/11).

. Luther L. McDougal III, La. Oil & Gas Law, Issue 5 (1992), Chap. 3.6; 4 Summers Oil & Gas (3 ed.) § 54.9; 4 Kuntz, The Law of Oil & Gas § 48.4.

. La. R.S. 31:114 ("operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened”); Hunter v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947); Patrick Martin, Law of Pooling & Unitization, 3 ed. § 9.01, p. 9-4.

. Stipulation 10 describes each of the five units, identifies the well for each unit and states the depth it reached.

. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649 (1961); Will-Drill Resources v. Huggs, supra.

. Caskey v. Kelly Oil Co., supra.

. Broussard v. Phillips Petroleum Co., 160 F.Supp. 905 (W.D.La.1958), aff’d, 265 F.2d 221 (5 Cir.1959).

. Rougon v. Chevron USA, supra; Roseberry v. Louisiana Land & Exploration Co., supra; Patrick Martin, op. cit., § 9.06, p. 9-21.